**UNITED STATES of America**

v.

**Trevis WALKER, Defendant.**

**No. 92 Cr. 320 (MBM).**

United States District Court,
S.D. New York.

Nov. 10, 1992.

Celeste L. Koeleveld, Asst. U.S. Atty., Southern District of New York, New York City, for U.S.

Inga L. Parsons, Federal Defender Services Unit, New York City, for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

Defendant Trevis Walker has moved pursuant to Fed.R.Crim.P. 12(b) to suppress guns and ammunition seized from his luggage and statements he made on April 8, 1992 after he got off an Amtrak train at New York's Pennsylvania Station. He argues that the facts available to the Amtrak officers who made the seizure were insufficient to justify detaining him pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). For the reasons set forth below, the motion is denied.

### I.

The evidence developed at a suppression hearing showed that at about 10:15 on the morning of April 8, an Amtrak police desk sergeant received an anonymous call from a male adult "stating that a male adult was coming from the south on one of our trains that day and he was to be carrying auto-

matic weapons." (Tr. 9)[1] That information was consistent with the experience of the Amtrak police, who were aware that guns often are transported to New York from Virginia. (Complaint ¶ 2; see Def. Mem. 2) The caller described the suspect as follows: "a male black adult, approximately five-eight to five-nine, he said very large male adult, huge and fat, something to that effect, he had short close-cropped hair, clean shaven," and approximately 25 years old. (*Id.*)

Sergeant Robert Collins of the Amtrak police received the report, wrote the description on a piece of paper, checked his schedule for the next train arriving from the south, and determined that train 88 would arrive at about 11:35 a.m. He distributed the description to three other officers and deployed them on the platform with instructions to raise a hand high in the air if any of them spotted a man fitting the description he had received. (Tr. 10–11) After the train arrived and passengers began to alight, one officer raised his hand and drew Collins' attention to "a very large male, black adult, very clean shaven and short hair and approximately it looked to me 24 to 25 years old," who stood "about five-ten." Collins identified the defendant as that person. (Tr. 12) The defendant stands 5'11" and weighs 470 pounds. (Tr. 49)

Collins and the other officers approached Walker. Collins asked Walker if he could talk to him away from the path of the passengers streaming toward the exits, and motioned to a nearby elevator bank. Walker was carrying two bags. Collins asked Walker whether he had just gotten off the train, and Walker said he had. The officer then asked Walker whether he was carrying any automatic weapons. When Walker said he was not, Collins showed him the piece of paper on which he had written the description received from the anonymous caller, told him that he matched the description and that the caller had said the person in question was carrying automatic weapons, and asked Walker whether he

---

1. "Tr." refers to the transcript of a suppression hearing on August 21, 1992.

could pat him down. Walker agreed, and the pat-down disclosed nothing remarkable.

Collins then asked Walker for identification. When Walker produced "a New York State ID card," Collins handed it to one of the other officers. (Tr. 14) Collins then turned his attention to Walker's two bags, which were resting on the ground, and asked Walker whether they were his. When Walker replied that they were, Collins asked whether he could search them. Collins testified that Walker refused: "He said no. And he said, 'Why are you harassing me?' " (Tr. 15)

In an affidavit submitted before the hearing, Collins reported that during his conversation with the defendant, "Walker became paler and began sweating profusely." (Collins Aff. ¶ 5) His testimony at the hearing was that the defendant "appeared to be sweating a little bit more than he had been and he seemed to be turning paler." (Tr. 15)

However, a report Collins filed on April 11, three days after the incident, made no mention of either perspiration or pallor. (GX 3500B) [2] Collins conceded at the hearing that he was trained to observe the demeanor of subjects during confrontations like the one at issue here; he was aware that demeanor—particularly such arguably damning stigmata as sweating and pallor—can be relied on to help justify a *Terry* stop. (Tr. 37, 44). Although he insisted that he could recall seeing Walker perspiring and turning pale, Collins could not explain why he had omitted that observation from his report. That report was four pages long, single-spaced. It included a detailed account of events on April 8, beginning with receipt of the tip and including more than a page about Collins' conversation with Walker; the report attributed both paraphrased and quoted statements to the defendant.

Collins told Walker that he intended to seize his bags and hold them at the Amtrak police command center until a dog trained to detect firearms and ammunition could be brought to sniff the bags. He said that if the dog reacted in a way that showed contraband was present, he would take steps to secure both a search warrant for the bags and an arrest warrant for Walker if the defendant had elected to leave before the procedure was complete. He said that if the dog did not detect contraband, and Walker was not present, he would arrange to have the bags delivered to the defendant's home. Walker lived in the Bronx. Collins estimated then that it would take less than two hours to secure a dog. (Tr. 15–16)

Walker elected to leave. As the officers and Walker were riding up the escalator from the platform, Collins asked how he intended to get home and the defendant responded that he would take a taxi. Collins then pointed to the exit at 31st Street and Eighth Avenue as the best location to get a taxi to the Bronx, and sent two officers with Walker, allegedly to "insure that he got in his taxi safely." (Tr. 33; see also Tr. 17–18)

When Collins returned to the command center he learned in a series of calls by telephone and two-way radio that the anonymous caller had called a second time and in addition to reiterating the earlier message had disclosed that he was calling from New York, that another officer had been told by an Assistant U.S. Attorney that the Amtrak police could have detained not only Walker's bags but also the defendant himself for up to an hour, and that Walker was on his way to the command center to talk to Collins. (Tr. 18–20)

Walker then entered the command center and told Collins that he did not think the sergeant had the right to search his bags. Collins responded that he had learned he had the right not only to seize the bags but also to detain Walker, and told the defendant to sit down. He then placed a call to Metro North, which had the necessary canine unit, and repeated aloud in the defendant's presence that he was being transferred to the canine unit. At that point, Walker said he would agree to permit his bags to be searched. (Tr. 20–23)

---

**2.** "GX" refers to a government exhibit.

Collins then summoned two other officers, placed Walker's bags on the table, and asked again whether Walker was giving him permission to search the bags. When Walker said he was, the sergeant asked again whether he had automatic weapons in his luggage. Walker said he had a 9–millimeter weapon in the larger of the two bags. When Collins opened that bag he found two 9–millimeter pistols. His report discloses that he found also 102 rounds of 9–millimeter ammunition and 19 shotgun shells. At that point the officers placed Walker under arrest. (Tr. 23–24; GX 3500B p. 3) The elapsed time between the confrontation on the platform and Walker's arrest was about 20 minutes. (Tr. 24)

A search incident to Walker's arrest disclosed that he had a bill of sale for one of the weapons from a South Carolina gun dealer. Walker said he had used a South Carolina motor vehicle identification card, obtained two days before, to buy the weapon from the dealer, and that he had bought the other weapon on the street from a crack dealer. He said he had bought the weapons for his own protection and had thought that if he registered them in South Carolina under his own name it would not be unlawful to transport them to New York. (GX 3500B p. 4)

Walker submitted an affidavit but did not testify at the hearing. His averments about the conversation on the platform conformed generally to Collins', except that he denied sweating profusely or turning pale. (Walker Dec. ¶ 2) He said he returned to the command center after he noticed that officers were following him:

> I approached the officers and asked them why they were following me if I was free to go. They told me to talk about it inside and come back down with them.

(Walker Dec.. ¶ 3) He stated that he was told the officers "had probable cause to hold me there." (*Id.*) He said he agreed to the search only after he concluded from the conversation he overheard that the officers were having difficulty getting a dog to sniff his luggage "and it appeared that it was going to be a long time before they could get a dog if at all." (*Id.*)

## II.

■ Walker makes two arguments. First, he argues that when he returned to the Amtrak command center and was told he was not free to leave, he was then in fact under arrest rather than merely detained pursuant to a *Terry* stop because he was in a police facility surrounded by all the indicia of authority and was not free to leave. That, in turn, would have required the arresting officers to have had probable cause rather than merely the reasonable suspicion needed to effect a *Terry* stop. That argument has little substance. Even on his own account, Walker returned voluntarily to the command center, albeit to protest what he thought was improper police conduct in following him. Walker chose the venue.

Further, Walker does not aver that he was told at any time before he consented to the search that he was under arrest. There is no evidence that Walker was versed in the distinction between probable cause and reasonable suspicion; therefore, his claim that an officer told him that there was "probable cause" to detain him, even if true, is without significance. The detention of Walker at the command center was a *Terry* stop, not an arrest.

■ Walker's second claim is that there was no reasonable suspicion to seize his bags. He argues that Collins' testimony about his perspiration and pallor is not worthy of belief, and that if that testimony is rejected the circumstances here were not sufficient to justify a *Terry* stop.

I agree that Collins' testimony in this respect was not credible for at least two reasons. First, it is difficult to believe that an officer on the alert for evidence that would generate reasonable suspicion and thereby justify a *Terry* stop, seeing a subject show signs of guilty nervousness, and knowing as Collins conceded he did that such signs would be considered relevant by a court assessing whether reasonable suspicion existed (Tr. 37, 44–45), would omit

mentioning the perspiration and pallor in his report.

Second, Collins' conduct at the time is more consistent with the conclusion that Walker betrayed no tell-tale signs of nervousness than with Collins' current recollection. If Walker had perspired and turned pale, and Collins was aware that such conduct would rationalize a *Terry* stop, presumably he would have detained Walker as well as his bags. Instead, he permitted Walker to leave but sent two officers to accompany him. Collins' justification for that step—to assure that Walker got safely to a taxi—is simply incredible. He offered no explanation for why a suspected gun-smuggler would excite such intense and beneficent constabulary concern, beyond the observation that Penn Station is always unsafe and that Amtrak officers protect passengers frequently. (Tr. 32–33, 45–46) Even that could not account for why he sent two men rather than one on this supposed mission of mercy. (Tr. 33) I find it far more likely that the two officers were sent to follow Walker closely in the hope that such close and obvious surveillance would make Walker do something sufficiently suspicious to justify detaining him. It appears that Collins was not sure the circumstances amounted to reasonable suspicion, but was not about to risk the possibility that weapons would find their way into this City's already sufficient turmoil, and so seized only the bags but not the defendant. When he learned that an Assistant U.S. Attorney had offered the view that he could seize the defendant, he did so, Walker having accommodated the authorities by returning voluntarily to the command center in what appears to have been an attempt to brazen the officers off the trail.

That leaves the question of whether the remaining circumstances were sufficient to justify a *Terry* stop. There is a Supreme Court case, *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), with facts close enough to those in the case at hand to show that a *Terry* stop was justified. In *White*, police received an anonymous tip that Vanessa White would leave a specified apartment at a particular time in a brown Plymouth station wagon with a broken right taillight lens, that she would have cocaine in a brown attache case, and that she would drive to a particular motel. The police went immediately to the building, and soon afterward White left the building and got into a brown Plymouth station with a broken right taillight lens, but she was carrying no attache case. She drove the most direct route toward the motel, and was stopped just short of it by the police. She agreed to let them search an attache case that apparently had already been placed in the car, and they found marijuana, whereupon she was arrested.

The Court reviewed the degree to which the tipster's information had been verified at the time of the stop. It noted that the precise apartment and the name of Vanessa White had not been verified. The Court concluded from the officers' immediate response and White's departure soon after they arrived that at least the "timeframe" predicted by the caller had been verified. 496 U.S. at 331, 110 S.Ct. at 2417. What the Court found most compelling was that White's *"future behavior"* had been predicted by the anonymous caller—that she would "shortly leave the building, get in the described car, and drive the most direct route to [the specified motel]." 496 U.S. at 332, 110 S.Ct. at 2417 (emphasis in original). The Court reasoned as follows:

> Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely also to have access to reliable information about that individual's illegal activities.

*Id.* The Court found that although *White* presented "a close case, we conclude that under the totality of the circumstances the anonymous tip, as corroborated, exhibited sufficient indicia of reliability to justify the investigatory stop of respondent's car." *Id.*

If one keeps in mind the inherent differences between the situation presented here and the one that faced the police in *White,* the result here follows *a fortiori* from the

result in *White*. Here, although the anonymous caller gave no particular arrival time, he did present a description that unmistakably matched this defendant—an unusually heavy black male about 25 years old, clean shaven and with close cropped hair—and predicted he would arrive in New York from the south. The police were aware that the route the subject would take included a likely source for the kind of contraband the subject was alleged to be carrying—guns.

At the time of the initial call, the police were unaware of the caller's location. Whether the call originated from the defendant's embarkation point or from his destination, there was no way for the caller to have known what the defendant would be wearing when he arrived in New York because, as disclosed by the train schedule submitted after the hearing, the defendant could have been travelling from a distance more than a day away and it is possible to change clothes on a train. (Enclosure to Sommer 10/13/92 letter to the Court) Moreover, there were at least six stops after the train left the last location anyone might refer to colloquially as the south— Alexandria, Va. (*Id.*) The caller knew that this defendant would not get off at any intervening stop but would continue to New York.

Here, unlike *White*, the police had a description that unmistakably fit the defendant. Thus it is fair to say that the caller in both cases provided a specific description—here, the description of Walker and in *White* the description of the vehicle. To be sure, in *White*, that specific description was of the car and therefore related to what Vanessa White would do. Here, the description related only to what the defendant looked like. On the other hand, the police in *White* could not or did not verify before they stopped the car that the person in the car was in fact Vanessa White, the name given by the anonymous caller. Here, the person who got off the train in New York was without doubt the person whom the anonymous caller had described.

To be sure, the caller in *White* predicted with more detail what Vanessa White would do than the caller here supplied in predicting what Walker would do. That caller said White would emerge from a particular building within a particular "timeframe," 496 U.S. at 331, 110 S.Ct. at 2417, and go in a particular car to a particular place; this caller said only that Walker would arrive in New York by train from the south and gave no particular time. But that distinction arises at least in part from the inherent difference between what the two defendants were doing. Vanessa White apparently was about to consummate a particular transaction; this defendant apparently was simply arriving in New York with contraband, to be the subject of use or commerce at a later time. It is difficult to see what more detail a caller could provide with respect to a subject's *future* actions in such a case.

The Amtrak police had information about a particular person and, as in *White* although necessarily in less detail, that person's itinerary. However, by contrast with *White*, there was not present here any significant contradiction between the caller's information and what the police saw. In *White*, the police were told that drugs would be carried in a brown attache case. When Vanessa White entered the car, she was empty-handed. There was nothing in the anonymous caller's tip here that would have led the police to question the accuracy of the caller's information as there was in *White*, where the circumstances nonetheless were found sufficient to justify a *Terry* stop.

The Court in *White* quoted its prior opinion in *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) to define the reasonable suspicion sufficient to justify a *Terry* stop, and to contrast that level of knowledge with the probable cause necessary to justify an arrest:

> " 'The officer [making a *Terry* stop] . . . must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.' " [*Terry*, 392 U.S.,] at 27 [88 S.Ct. at 1883]. The Fourth Amendment requires "some minimal level of objective justification" for

making the stop. *INS v. Delgado,* 466 U.S. 210, 217 [104 S.Ct. 1758, 1763, 80 L.Ed.2d 247] (1984). That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found," [*Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)], and the level of suspicion required for a *Terry* stop is obviously less demanding than for probable cause.'" *White,* 496 U.S. at 329–30, 110 S.Ct. at 2416 (brackets in original).

It is apparent from the caller's description that he knew Walker. It is also apparent that he knew enough about the defendant's activities to know that he would get off in New York rather than at another stop. Again, if we bear in mind that we are dealing with a person arriving in a large city with contraband rather than with a person on her way from one place to another apparently to effect a particular transaction in contraband, it is difficult to imagine what more the caller should have been required to say in order for a police officer receiving the information to have had reasonable suspicion that the caller knew what he was talking about when he said Walker was carrying guns. The additional fact a caller might have supplied that was present in *White* but not here was the defendant's ultimate destination. However, inasmuch as Walker was simply arriving from out of town with the guns rather than being on his way to sell them, it would not have added much to the equation for the caller to have said Walker was going home or that he lived in the Bronx. That would simply have shown that the caller knew where Walker lived, a redundancy in view of the caller's knowledge of who Walker was, made obvious by the detailed description of Walker.

Moreover, following up Walker's destination would have required the railroad police, whose responsibility is to patrol railroad premises and who cannot be expected to have surveillance vehicles at their immediate disposal, to have enlisted the New York City police immediately to follow Walker as far as the Bronx before they stopped him. It is unreasonable to expect that such surveillance could have been arranged successfully in the brief moments between Walker's arrival and his entry into a taxi at no prearranged location in the vicinity of a busy railroad station. In sum, Walker's destination would have been unverifiable and therefore useless even if provided.

If, as the Supreme Court wrote, reasonable suspicion is simply an articulable set of circumstances that constitutes "'more than an "inchoate and unparticularized suspicion or 'hunch,'" *White,* 496 U.S. at 329, 110 S.Ct. at 2416, quoting *Terry,* or "'some minimal level of objective justification,'" *id.* at 330, 110 S.Ct. at 2416, quoting *Delgado,* that standard was met here: The caller knew who the defendant was, predicted that he would get off in New York and, unlike *White,* did not offer any information that was contradicted by what the officers saw.

Understandably, Walker has emphasized that the Court described *White* as a "close case," 496 U.S. at 332, 110 S.Ct. at 2417, and argues that the information in this case was less specific and therefore less reliable on the whole than the information in *White.* But the Court did not identify what made *White* a close case. The most obvious reason to doubt the source of the tip in *White* was the apparent contradiction between the description of the attache case and the fact that Vanessa White was not carrying anything when she emerged from the building in question. There was no such contradiction here, which makes this case stronger in that respect. But beyond that, there is a danger in subjecting such unexplained phrases as "close case" to more analysis than they will stand, even when they appear in the United States Reports. In the end, the more reliable guide for decision here is how the Court chose to articulate the governing rule—"'... something more than an "inchoate and unparticularized suspicion or 'hunch.'" ... some minimal level of objective justification for making the stop.'" *White,* 496 U.S. at

329–30, 110 S.Ct. at 2416, quoting *Terry* and *Delgado*—and not the hypothesized meaning of "close case."

When one adds to the caller's unmistakable description of Walker and his prediction that Walker would get off in New York the caller's disclosure that Walker was carrying guns and the officers' awareness that Walker was traveling from an area that was a likely source of such contraband, there was reasonable suspicion to detain Walker and his luggage, and Walker's subsequent consent to search was voluntary. Walker does not contend that any statements he made following his arrest were made before he was advised of his rights, or that it was necessary to advise him of his rights before his arrest. Therefore, the motion to suppress must be denied in its entirety.

SO ORDERED.