**UNITED STATES of America, Appellee,**

v.

**Trevis WALKER, Defendant–Appellant.**

**No. 1597, Docket 93–1105.**

United States Court of Appeals,
Second Circuit.

Argued June 15, 1993.

Decided Oct. 4, 1993.

David A. Lewis, The Legal Aid Society, Federal Defender Services Unit, New York City, for defendant-appellant.

Celeste L. Koeleveld, Asst. U.S. Atty., S.D.N.Y., New York City (Roger S. Hayes, Acting U.S. Atty., Paul G. Gardephe, Asst. U.S. Atty., of counsel), for appellee.

Before: KEARSE, PRATT, and MINER, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

## FACTS AND BACKGROUND

At 10:15 a.m. on April 8, 1992, an anonymous male telephoned the Amtrak police in New York City, stating that a man coming from the south on one of the trains would be carrying automatic weapons. The caller described the suspect as a black male, approximately 5′8″ to 5′9″, approximately twenty-five years old, very large and fat, clean shaven, with short close-cropped hair. When the Amtrak radio-desk sergeant attempted to elicit more information from the caller, including the name of the individual, the city the caller was calling from, and a better description of the man alleged to have the guns, the caller hung up without answering the sergeant's questions.

The radio-desk sergeant relayed the information to Sergeant Robert P. Collins, a member of the criminal investigative division of Amtrak, in New York City's Pennsylvania Station ("Penn Station"). Collins wrote the description on a piece of paper, checked the schedule for the next train arriving from the south, and determined that train 88 from Miami, Florida, originally scheduled for an 11:00 a.m. arrival, was due to arrive at about 11:35 a.m. He distributed the description to three other officers, and they all went down to the arrival platform for train 88. If any of the officers saw a person who fit the description, he was to signal the others by raising a hand high in the air. When Officer Williams spotted Trevis Walker, the defendant, he signaled accordingly. Walker is a twenty-three year old black man who is 5′11″ tall and weighs 470 pounds. At the time he was clean shaven, with close-cropped hair. Walker was carrying two bags.

The officers approached Walker and displayed their identifications. Sergeant Collins asked Walker if he could talk to him. Walker agreed, and Collins asked him to move toward an elevator wall away from the stream of exiting passengers. Once out of the flow of traffic, Collins asked Walker if he had gotten off the train, and Walker replied that he had. Collins asked for Walker's ticket stub; Walker told him that he had left it on the train. When Collins asked Walker whether he had any automatic weapons, Walker said no and asserted that he had not done anything wrong. Collins then showed Walker the piece of paper on which he had written the description received from the anonymous caller, told him that he matched the description and that the caller had said the person in question was carrying automatic weapons, and asked Walker whether he could pat him down. Walker consented. The pat down revealed no weapons or contraband.

When asked for identification, Walker gave Collins his New York State identification card. Instead of following Amtrak police procedure and promptly returning the card, Collins handed the card to Officer Williams, who retained it. Collins then asked if the two bags Walker was carrying were his, and Walker said they were. Collins inquired if the bags contained any automatic weapons. Walker responded that they did not.

At this point Collins claims that Walker began sweating a bit more than he had been and turned paler. However, Collins' initial report omitted these facts. His first mention of them appeared in his affidavit in response to Walker's motion to suppress. Because Collins knew it was important to report anything relevant to determining reasonable suspicion, including signs of nervousness, but failed to mention any such symptoms in his report on Walker, the district court concluded that Collins' testimony regarding Walker's perspiration and pallor was not credible.

Walker refused to consent to a search of his bags and asked the officers why they were harassing him. Collins replied that he was acting within his "guidelines according to the parameters of the law" and that since Walker fit the description, he was going to seize Walker's bags. Collins again asked Walker if he was carrying any automatic weapons; Walker again said no. Collins told Walker that they were going to get a trained munitions dog, a process that would take less than two hours, and in the event the dog indicated that the bags contained weapons, he would obtain a search warrant.

Collins informed Walker that the bags would be taken to the Amtrak command center in Penn Station for the dog sniff. Another officer then took the bags and left. Collins told Walker that he was free to leave or that he could stay and watch the procedure. He said that if the dog did not alert to any weapons, he would have the bags delivered to Walker's home. Walker opted to leave and went to get a taxi. Collins instructed two other officers to follow him, allegedly to "insure that he got in his taxi safely".

Once back at the Amtrak command center, Collins learned that the tipster had called again, reiterated the earlier message, and disclosed that he was calling from New York City. Another officer informed Collins that an assistant United States attorney had said that the Amtrak police could have detained not only Walker's bags but also Walker himself for up to an hour.

On his way to the Eighth Avenue exit from Penn Station, Walker told one of the escorting officers that he did not want them to look in his bags. The officer replied that if Walker had any questions, he should direct them to Sergeant Collins. Walker decided to go to the command center to talk to Collins. When he got there, he told Collins that he had done nothing wrong and that he did not think they had grounds to search his bags. Collins informed Walker that he had just learned that he could not only detain the bags, but also Walker himself, during the time needed to have a dog sniff the bags. He then asked Walker to have a seat. As Walker sat down, Collins called Metro North and repeated aloud in Walker's presence that his call was being transferred to the canine unit. When he was told that a dog was available and that it would take twenty to thirty minutes to bring the dog from Yonkers, New York, he relayed this information to Walker. At that point, Walker said that he would permit them to search his bags.

The officers discovered two nine-millimeter pistols, 102 rounds of nine-millimeter ammunition, and nineteen shotgun shells in Walker's bags. They subsequently arrested Walker and advised him of his rights. A search incident to the arrest revealed that Walker had a bill of sale for one of the weapons, showing that he had purchased it from a South Carolina gun dealer for $278. Walker said that he had used a South Carolina motor vehicle identification card to buy the pistol from the dealer and that he had bought the other pistol from a crack user on the street for $100 because he could not resist getting it at that price. He said he had bought the weapons only for his own protection because he had been robbed several times and was often harassed due to his large size. He also said that he had intended to buy the guns legally and would never have transported them to New York if he had known it was illegal to do so.

Walker was charged in a one-count indictment with transporting weapons in interstate commerce in violation of 18 U.S.C. § 922(a)(3). Initially, Walker pled not guilty. He moved to suppress the evidence, claiming that the Amtrak officers had lacked reasonable suspicion to seize and search his bags. After a hearing in the United States District Court for the Southern District of New York,

Michael B. Mukasey, *Judge,* his motion was denied. The district court held:

> When one adds to the caller's unmistakable description of Walker and his prediction that Walker would get off in New York the caller's disclosure that Walker was carrying guns and the officers' awareness that Walker was traveling from an area that was a likely source of such contraband, there was reasonable suspicion to detain Walker and his luggage.

*United States v. Walker,* 805 F.Supp. 1112, 1119 (S.D.N.Y.1992). Walker then entered a conditional guilty plea, reserving the right to appeal the denial of his motion to suppress. *See* Fed.R.Crim.P. 11(a)(2). He was sentenced to two years' probation, including six months in home detention.

Walker now appeals the district court's denial of his suppression motion.

## DISCUSSION

In reviewing the district court's ruling on the motion to suppress, we will uphold findings of fact—what information the officers had, what acts were performed, and what statements were made—unless they are clearly erroneous. *United States v. Uribe–Velasco,* 930 F.2d 1029, 1032 (2d Cir.1991). We review *de novo* the district court's determination of whether the police had reasonable suspicion. *United States v. Springer,* 946 F.2d 1012, 1015 (2d Cir.1991).

A police officer may in appropriate circumstances and in an appropriate manner stop a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest. *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). The test is whether

> a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. * * * And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled

to draw from the facts in light of his experience.

*Id.* at 27, 88 S.Ct. at 1883 (citations and footnote omitted); *see also United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (officer must be able to articulate something more than inchoate and unparticularized suspicion or hunch). In *United States v. Place,* 462 U.S. 696, 702, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983), the Supreme Court held that the *Terry* principles also applied to the seizure of "personal luggage from the custody of the owner on the basis of less than probable cause".

Reasonable suspicion is dependent upon both the content of information possessed and its degree of reliability. *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990). When evaluating tips from informants, courts must examine the totality of the circumstances. *Illinois v. Gates,* 462 U.S. 213, 230–32, 103 S.Ct. 2317, 2328–29, 76 L.Ed.2d 527 (1983) (probable cause for warrant); *United States v. Salazar,* 945 F.2d 47, 50 (2d Cir.1991) (reasonable suspicion for *Terry* stop), *cert. denied,* —— U.S. ——, 112 S.Ct. 1975, 118 L.Ed.2d 574 (1992).

The district court relied almost exclusively on the Supreme Court's decision in *Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, stating that "the result here follows *a fortiori* from the result in *White*". *Walker,* 805 F.Supp. at 1116–17. In *White,* an anonymous caller stated that Vanessa White would be leaving 235–C Lynwood Terrace Apartments at a particular time in a brown Plymouth station wagon with a broken right taillight, that she would drive to Dobey's Motel, and that she would have an ounce of cocaine inside a brown attaché case. *Id.* 496 U.S. at 327, 110 S.Ct. at 2414. Subsequently, the police waited outside the Lynwood Terrace Apartments. They saw a brown Plymouth station wagon with a broken right taillight parked in front of the 235 building. The officers saw Vanessa White leave the 235 building, carrying nothing in her hands, and get into the station wagon. They followed the car, which took the most direct route to Dobey's Motel. After White reached the street on which the motel was located, a patrol unit stopped her.

The officers found a locked brown attaché case in the car; White gave them the combination for the lock. The police found marijuana inside. After they brought White to the police station, the police discovered three milligrams of cocaine in her purse. *Id.* The Court held that under the totality of the circumstances the officers had reasonable suspicion to stop White.

█ As in *White,* the tip in this case took the form of an anonymous telephone call. In contrast to an informant the police have previously dealt with, *see, e.g., Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *United States v. Pena,* 961 F.2d 333 (2d Cir.1992), or a face-to-face informant, *see, e.g., Salazar,* 945 F.2d at 50–51 ("face-to-face informant must * * * be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false"), anonymous tips generally fail to demonstrate the informant's basis of knowledge or veracity sufficient to provide the reasonable suspicion necessary for a *Terry* stop. *White,* 496 U.S. at 329, 110 S.Ct. at 2415 (citing *Gates,* 462 U.S. at 237, 103 S.Ct. at 2331). "[I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Id.* 496 U.S. at 330, 110 S.Ct. at 2416.

█ Like the tip provided in *White,* the anonymous tip in this case did not provide information from which to conclude that the caller was honest or his information reliable. *See id.* at 329, 110 S.Ct. at 2415; *see also Gates,* 462 U.S. at 225, 103 S.Ct. at 2325 (anonymous letter does not reveal basis of author's knowledge of suspects' methods for obtaining narcotics in Florida). Similarly, the tip gives no indication of the basis for the caller's predictions regarding Walker's criminal activities. *See White,* 496 U.S. at 329, 110 S.Ct. at 2415. Because the degree of reliability of the tip in this case is low, more is required if the tip is to "establish the requisite quantum of suspicion". *Id.* at 330, 110 S.Ct. at 2416.

When the district court evaluated the information given in the tip, it placed great weight on the accuracy of its description and its prediction of Walker's destination. In terms of the description, the court commented that it was "apparent from the caller's description that he knew Walker". *Walker,* 805 F.Supp. at 1118. While the tip certainly could have provided more information, for example, the suspect's name, address, point of departure, and mode of dress, Judge Mukasey concluded that since the tip's detailed physical description demonstrated that the caller knew Walker, additional facts, such as where Walker lives, would have been redundant. Judge Mukasey reasoned that it was "difficult to imagine what more the caller should have been required to say in order for a police officer receiving the information to have had reasonable suspicion that the caller knew what he was talking about when he said Walker was carrying guns". *Id.*

The *White* court relied on *Gates,* 462 U.S. at 245, 103 S.Ct. at 2335, for the proposition that a tip's ability to predict future behavior increases its degree of reliability. 496 U.S. at 331–32, 110 S.Ct. at 2416–17. Because future actions of third parties are not easily predicted, and usually only a select few are privy to an individual's itinerary, a tipster armed with such information may be considered well informed. *Id.* In *White,* the tip predicted when the suspect would be leaving and where she would be driving. *Id.* at 327, 110 S.Ct. at 2414. In *Gates,* the tip predicted when the wife would leave, how she would travel, when the husband would leave, and how he would return. 462 U.S. at 225, 103 S.Ct. at 2325. The tips in both cases contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions that were not easily predicted. *See White,* 496 U.S. at 332, 110 S.Ct. at 2417.

In this case, the tip predicted that Walker would be traveling on a train from the south and that he would arrive in New York City. While it may not have contained as much "predictive" information as the tips in *White* and *Gates,* the district court concluded that the caller "knew enough about the defendant's activities to know that he would get off in New York rather than at another stop." *Walker,* 805 F.Supp. at 1118.

The totality-of-the-circumstances inquiry also entails consideration of information, aside from the tip itself, possessed by the police before they made the *Terry* stop. In particular, independent corroboration of significant aspects of a tip's predictions imparts some degree of reliability to the other allegations made by the caller. *White,* 496 U.S. at 332, 110 S.Ct. at 2417. Police verification of the "innocent" factors of a tip lends support to a reasonable suspicion determination, because it would be reasonable for the police to believe that the allegations of illegality will be true as well.

In *White,* several aspects of the tip—the suspect's name, her apartment number, and her ultimate destination—were not verified before the stop, and another aspect—that she would have an attaché case with her—was not evident before the stop. 496 U.S. at 331, 110 S.Ct. at 2416. Nevertheless, while recognizing that it was "a close case", *see id.* at 332, 110 S.Ct. at 2417, the Court held that under the totality of the circumstances, the *Terry* stop was justified.

In this case, nearly every aspect of the tip was independently verified before the police seized Walker's bags. Walker's appearance matches the general physical description the caller gave—a black male, very large, clean shaven, with short close-cropped hair. Walker stands only a couple of inches taller and is only slightly younger than the tip had indicated. The police also knew Walker had arrived on a train from the south, where illegal guns are readily available. Judge Mukasey found that the tip "unmistakably matched" Walker. We cannot say that his conclusion was clearly erroneous.

Standing alone, the anonymous tip provided few independent indicia of reliability. However, because the police verified nearly every aspect of the tip, we conclude that under the totality of the circumstances the police had reasonable suspicion to seize Walker's bags for inspection. Walker's suppression motion was properly denied.

KEARSE, Circuit Judge, dissenting:

I respectfully dissent. It seems to me that in this case the authorities had less verifiable information than in any other case in which the Supreme Court or this Court has held there was sufficient information to give the authorities the reasonable suspicion needed to make a *Terry* stop.

In the present case, the authorities simply received an anonymous telephone call stating that "a male black adult, approximately five-eight to five-nine . . . huge and fat . . . [with] short close-cropped hair, [and] clean shaven," would soon arrive on a train to New York and would be carrying weapons. Since the call was anonymous, the informant was not known to be reliable; the only corroboration for the tip, prior to the eventual discovery of the weapons, was the authorities' observation of a man meeting the telephoned description disembarking from the train. In my view this was insufficient. The tip contained virtually no predictive information from which the authorities could reasonably determine that this informant had any "inside information [or] a special familiarity with [the accused's] affairs," *Alabama v. White,* 496 U.S. 325, 332, 110 S.Ct. 2412, 2417, 110 L.Ed.2d 301 (1990). Any mischievous member of the public could observe a distinctive-looking or distinctively-dressed person purchase a train ticket or board a train and could telephone a description and an accusation ahead to authorities at the train's destination. I believe that some indicium of reliability other than merely an accurate description of an individual's physique and whereabouts, which any observant stranger could provide, should be required before the individual may be stopped and detained.

The end result in this case, *i.e.,* the authorities' eventual discovery of the contraband, cannot contribute to the reasonable suspicion needed to permit the initial stop and inquiry. I would conclude that reasonable suspicion was lacking.