**UNITED STATES of America, Appellant,**

v.

**Steven BOLD, Defendant–Appellee.**

**No. 672, Docket 93–1477.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 13, 1993.

Decided March 17, 1994.

Judith Lieb, Asst. U.S. Atty. for Eastern Dist. of New York (Zachary W. Carter, U.S. Atty. for Eastern Dist. of New York, David C. James, Asst. U.S. Atty., of counsel), for appellant.

David A. Lewis, The Legal Aid Society, Federal Defender Services Unit, New York City, for defendant-appellee.

Before: FEINBERG, WINTER, and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

## FACTS AND BACKGROUND

On November 12, 1992, at about 4:20 p.m., five New York City policemen responded to a police radio call of an anonymous tipster that in the parking lot of a White Castle restaurant at the corner of Pennsylvania and Wortman Avenues in Brooklyn there was a four-door gray Cadillac with three black males, one of whom was armed with a gun. The armed man was reported to be 21 years old and wearing a hooded sweater.

The first policemen to reach the scene were Housing Authority police officers Timothy Brown and Richard Ferris. They entered White Castle's parking lot, and approached a gray Cadillac that was parked, alone, at the back of the lot, about eight parking spaces from the White Castle building. They drove behind the Cadillac and parked at an angle so that the car could not move out of its parking space and so they would be in the car's blind spot. Officer Brown proceeded immediately toward the rear passenger side of the Cadillac. He could not see into the car, however, because

its windows were darkly tinted, a circumstance that "aroused [his] caution level."

Officer Brown opened the back door of the car and looked in. Seeing two black men in the front seat, he said to them, "Gentlemen, please step out of the car." The passenger, later identified as Scott Burt, opened his door and stepped out of the car as directed. As he did so, officer Brown saw money in his lap, and more money fall from under his shirt to the ground. Officer Brown then patted Burt down, but found no weapon on him. He then moved Burt to the front of the car so the other officers could search it.

Officer James Lavin, a foot patrolman, also responded to the radio call; he arrived at the scene as the Housing Authority officers were pulling up. Lavin approached the car and directed the driver, defendant Steven Bold, to get out; he then searched Bold for a weapon, but found nothing. While other officers searched the car, Lavin "kept the defendant on the car", that is, he had Bold keep his hands on the automobile with the officer's own "hand on the top of his back" so that Bold could not move at all. Bold was not moved from this position until he was formally placed under arrest about 25 minutes later.

Two other officers of New York City's 75th precinct, Emilio Fusco and James Kuhlmeier, responded to the radio call. After Lavin frisked Bold, Fusco looked into the car. On the floor he saw money, including $100 bills. He also saw on the floor what appeared to be a gun. When he picked the "gun" up, he realized it was a plastic toy gun.

Kuhlmeier at that point remembered that there had been a robbery earlier in the day at the Anchor Savings Bank on Liberty Avenue in Brooklyn. He radioed for a description of the robbers and obtained one that matched that of Steven Burt. He also learned that the robber had worn a tweed coat and carried a briefcase, two items that the officers had found in their search of the car. Burt and Bold were then placed under arrest and later were indicted for bank robbery.

Bold moved to suppress the evidence found in the car as well as some incriminatory statements he later made, on the ground that they were the fruits of the search and seizure in the White Castle parking lot, which were unlawful because they were made without reasonable suspicion. Specifically, Bold argued (1) that, "standing alone", an anonymous tip of a man with a gun does not amount to reasonable suspicion justifying a seizure, (2) that the reliability of the anonymous tip is not shown simply by corroborating easily obtained facts existing at the time of the tip, (3) that mere confirmation that a gray Cadillac was located at a specific White Castle could not add to the reliability of the report that one of the Cadillac's occupants had a gun, and (4) that there were here none of the factors present in other cases—prior information about the informant, significant observations at the scene giving credence to the tip, or the location being noteworthy for the type of crime alleged—that would raise the tip to the level of a reasonable suspicion. The district court properly focused its analysis on whether the officers had, at the time they opened the car doors, a "reasonable suspicion" under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). As the district court said,

> [T]he suppression motion turns on the resolution of the issue of whether the information from the anonymous caller gave rise to the "reasonable suspicion" required for the police officers to open the doors of the Cadillac and order the occupants out so they could be frisked.

*United States v. Bold,* 825 F.Supp. 25, 28 (E.D.N.Y.1993).

The district court suppressed the evidence. Relying on *Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), it held that an anonymous tip does not provide the basis for reasonable suspicion if it is corroborated only by "easily obtained facts and conditions existing at the time of the tip" and that "independent corroboration by the police of significant aspects of the informer's predictions" was required. *Bold,* 825 F.Supp. at 28. The court then examined the possible sources of corroboration for the tip in this case, and found none sufficient to establish reasonable suspicion under *White.* Specifically, the court held (1) that there was

insufficient corroboration for the anonymous "911" call, (2) that the caller's information did not include any predictions of future behavior by the defendant, and (3) that the officers had not made any "significant" observations at the scene that lent credence to the tip. *Id.* Judge Korman therefore granted the suppression motion.

Unfortunately for Bold, four months·after the district court suppressed the evidence, we held, in circumstances closely analogous to those in this case, that an anonymous tip of a suspect with guns created a reasonable suspicion justifying a brief detention and search. *United States v. Walker,* 7 F.3d 26 (2d Cir.1993). *Walker* requires reversal in this case.

## DISCUSSION

■ In reviewing a district court's ruling on a motion to suppress, we will uphold findings of fact—what information the officers had, what acts were performed, and what statements were made—unless they are clearly erroneous. *United States v. Uribe–Velasco,* 930 F.2d 1029, 1032 (2d Cir.1991). We review *de novo,* however, the district court's legal conclusion of whether the police had reasonable suspicion. *Walker,* 7 F.3d at 29; *see also United States v. Springer,* 946 F.2d 1012, 1015 (2d Cir.1991).

■ A police officer may, in appropriate circumstances and in an appropriate manner, stop a person for purposes of investigating possibly criminal behavior, even though there is no probable cause to make an arrest. *Terry v. Ohio,* 392 U.S. at 22, 88 S.Ct. at 1880. The test is whether

a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger * * *. And in determining whether the officer acted reasonably. in such circumstances due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

*Id.* at 27, 88 S.Ct. at 1883 (citations and footnote omitted); *see also United States v.*

*Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (officer must be able to articulate something more than inchoate and unparticularized suspicion or hunch).

■ Reasonable suspicion depends upon both the content of the information possessed and its degree of reliability. *White,* 496 U.S. at 330, 110 S.Ct. at 2416. When evaluating tips from informants, courts must examine the totality of the circumstances. *United States v. Salazar,* 945 F.2d 47, 50 (2d Cir. 1991) (required reasonable suspicion for *Terry* stop), *cert. denied,* —— U.S. ——, 112 S.Ct. 1975, 118 L.Ed.2d·574 (1992).

■ In contrast to an informant the police have previously dealt with, *see Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), or a face-to-face informant, *see, e.g., Salazar,* 945 F.2d at 50–51 (face-to-face informant must be thought more reliable than an anonymous telephone tipster, for former runs the greater risk that he may be held accountable if his information proves false), anonymous tips generally fail to demonstrate the informant's basis of knowledge and/or independent veracity sufficient to provide the reasonable suspicion necessary for a *Terry* stop. *White,* 496 U.S. at 329, 110 S.Ct. at 2415. "[I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip was more reliable." *Id.* at 330, 110 S.Ct. at 2416.

■ Like this appeal, *Walker* involved the issue of whether reasonable suspicion existed after police were able partially to confirm an anonymous tip. In *Walker,* the anonymous tip was that a black man would arrive in New York that day on a train from the south and would be carrying automatic weapons. The suspect was described as "a black male, approximately 5'8" to 5'9", approximately twenty-five years old, very large and fat, clean shaven, with close-cropped hair." The·tip did not include the suspect's name, the city from which the train originated, the place where the subject had boarded the train, or the time of day the train was scheduled to arrive in New York. Police went to Penn Station, and when they saw a man getting off

a train from Miami whose appearance was generally consistent with the description provided by the tipster, they stopped and questioned him. When the police searched his luggage they found illegal firearms and ammunition, and then arrested him. We upheld the seizure, confirming that the evaluation of a police response to an anonymous tip must be based upon the "totality of the circumstances." *Walker*, 7 F.3d at 31. The court noted that

> Police verification of the "innocent" factors of a tip lends support to a reasonable suspicion determination, because it would be reasonable for the police to believe that the allegations of illegality will be true as well.

*Id.*

As in *Walker*, the anonymous tip in this case did not itself provide information from which to conclude that the caller was honest or his information reliable. However, even before opening the car doors, the observations of the officers corroborated the tipster's report of a particular type of car (a four-door gray Cadillac) in a particular location (the parking lot of the White Castle restaurant at Wortman and Pennsylvania Avenues in Brooklyn). Verification of this information supports the reliability of the tip. Moreover, as the district court recognized, the reason the officers were unable to obtain additional corroboration was that they could not see through the car's darkly tinted windows. Also, the location of the car in a remote part of the parking lot, as police officer Lavin testified, "raised my suspicion that they might be having something to hide." *See United States v. Alvarez*, 899 F.2d 833, 837 (9th Cir.1990) (anonymous tip about occupant of car was sufficiently corroborated where car was observed in a parking lot "unusually positioned—front end facing outward" and departed scene after marked police cars drove out of sight), *cert. denied*, 498 U.S. 1024, 111 S.Ct. 671, 112 L.Ed.2d 663 (1991). We conclude that in light of the *Walker* holding, the police officers' independent corroboration of the anonymous tipster's information, the unusual location of the car in the parking lot, and the inability of the officers to see in the darkly tinted car windows, when

combined with the report of a firearm in the car, provided a sufficient basis under *Terry* for the officers to further investigate by opening the car doors and requesting the occupants to get out for questioning.

*White*, the primary authority relied on by the district court, does not require a contrary result. There, the police received an anonymous telephone tip that White would be leaving a particular apartment, at a particular time, in a particular vehicle; that she would be going to a particular motel; and that she would be in possession of cocaine. They immediately proceeded to the apartment building, saw a parked vehicle matching the caller's description, observed a woman as she left the building and entered the vehicle, and followed her along the most direct route toward the motel, stopping her vehicle just short of the motel. A consensual search of the vehicle revealed marijuana and, after White was arrested, cocaine was found in her purse. The Supreme Court held that, standing alone, the tip there was completely lacking in the necessary indicia of reliability, since it provided virtually nothing from which one might conclude either that the caller was honest or his information reliable, and gave no indication of the basis for his predictions regarding White's criminal activities. As the events unfolded, however, the totality of the circumstances, demonstrated that significant aspects of the informant's story were sufficiently corroborated to furnish reasonable suspicion. Although not every detail was verified—e.g., the name of the woman leaving the apartment building or the precise apartment from which she left—the officers did corroborate that a woman left the building, got into the described car, and travelled in the predicted direction.

As in *White*, the tip in this case took the form of an anonymous telephone call. Unlike *White*, however, the anonymous tipster in this appeal did not predict future events, but instead advised the police of a present situation that three men possessed a gun and were inside in a particular car, in a particular parking lot, outside of a particular restaurant. There was no need here for any predictions of future conduct, because when verified by the officers, the tipster's information

was sufficient under *Terry* to warrant further investigation.

■ There is nothing in *White* that precludes police from acting on an anonymous tip when the information to be corroborated refers to present rather than future actions. *United States v. Clipper*, 973 F.2d 944, 949 (D.C.Cir.1992) ("*Alabama v. White* does not establish a categorical rule conditioning a *Terry* stop (when police are acting on an anonymous tip) on the corroboration of predictive information.").

Furthermore, in *White*, the anonymous tip related to a drug deal; the tip here related to a man with a gun. The distinction is significant and important:

> Th[e] element of imminent danger distinguishes a gun tip from one involving possession of drugs. If there is any doubt about the reliability of an anonymous tip in the latter case, the police can limit their response to surveillance or engage in "controlled buys". Where guns are involved, however, there is the risk that an attempt to "wait out" the suspect might have fatal consequences.

*Id.* at 951.

■ Where the tip concerns an individual with a gun, the totality-of-the-circumstances test for determining reasonable suspicion should include consideration of the possibility of the possession of a gun, and the government's need for a prompt investigation. *Id.* at 949–51. "The unique dangers presented to law officers and law-abiding citizens by firearms are well chronicled." *Id.* An officer who is able to corroborate other information in an anonymous tip that another person is in actual possession of a gun is faced with an "unappealing choice". *United States v. McClinnhan*, 660 F.2d 500, 502 (D.C.Cir. 1981). He must either stop and search the individual, or wait until the individual brandishes or uses the gun. *Id.* at 502–03.

The district court painted a frightening picture when it noted that (1) 200 million handguns and other lethal firearms are in circulation in the United States, (2) more than 4.2 million firearms are added to that total each year, and (3) these weapons caused some 37,000 gunshot deaths in the United States in 1990, and approximately 259,000

nonfatal injuries. *Bold*, 825 F.Supp. at 32. Moreover, New York City has a population of approximately eight million, yet as the district court found, only 122,137 pistols are licensed in the city. Those circumstances might be supplemented by the facts that (1) the City of New York, where those officers served and protected, has a well-documented history of illegal hand-gun possession, *see, e.g.*, "Bullets Fly, Innocents Die", *New York Newsday*, November 7, 1993, p. 4, and (2) New York State has approximately eighteen million people according to the 1990 census, yet has only issued gun permits to approximately eighteen thousand people a year from 1982 to 1992. *1993 New York State Statistical Yearbook*, p. 284 (18th ed. 1993). In short, the overwhelming majority of the people in New York State and City are not licensed to carry handguns.

Considering the totality of the circumstances in this case, including the limited ability of the officers to confirm all of the anonymous tip information, the report that the occupants of the car possessed a gun, and the statistical likelihood that the gun was illegal, we conclude that the intrusion upon the privacy of the car's occupants was minimal and that the officers had a reasonable suspicion under *Terry* that authorized their opening of the car doors and questioning the occupants. We therefore reverse the district court's order granting the motion to suppress.