**UNITED STATES of America**

v.

**Antonio FERNANDEZ, a/k/a "King Tone," Defendant.**

**No. 96 CR 141 (SAS).**

United States District Court, S.D. New York.

Aug. 23, 1996.

---

Steven M. Cohen, Assistant United States Attorney, New York City, for United States of America.

Ronald Kuby, Eve S. Rosahn, New York City, for Defendant Antonio Fernandez.

## MEMORANDUM OPINION

SCHEINDLIN, District Judge:

Defendant Antonio Fernandez is charged with knowingly possessing a firearm in violation of 18 U.S.C. § 922(g)(1), which prohibits firearm possession by convicted felons. Defendant moves to suppress physical evidence seized from him during a police search conducted on May 12, 1995, as well as a statement he allegedly made at that time.

### I. Factual Background

On May 12, 1995, Sergeant Keith Loughran and Officer James Murphy of the 48th Precinct were on duty on routine patrol. Shortly after 7:00 p.m., they received a radio run directing them to investigate a 911 call reporting a meeting of the Latin Kings at a park on Fairmont Place and Clinton Avenue. Tr. 18.[1] An anonymous caller had reported that at least one of the gang members was armed with a gun. He was described as a male Hispanic wearing a white jacket with black stripes. No further description was given.[2] See Def.Ex. A.

When they arrived at the park, Sergeant Loughran and Officer Murphy were joined by Officers Pardo, Parco and Wood, all of the 48th Precinct. Sergeant Loughran and Officer Murphy observed a group of 50 or 60 young men meeting in a circle, and a smaller group of three or four men standing off to the side. One of the men in the smaller group was defendant Fernandez. Each officer glanced at both groups, but Sergeant Loughran ended up focusing on the larger group and Officer Murphy on the smaller group. Tr. 21–22, 45–46, 93–94.

---

1. Citations in this form refer to the transcript of the suppression hearing held from June 26–27, 1996.

2. The computerized printout of the radio run indicates that the tipster also mentioned a second individual. He was described as an Hispanic male wearing a black jacket, jeans and black sneakers. See Def.Ex. A. No testimony was offered at the suppression hearing regarding this second individual.

Sergeant Loughran testified that he saw an individual who "somewhat fit the description" given by the anonymous caller, although he was unable to recall what the individual was wearing. Tr. 95, 101. Sergeant Loughran asked the suspect whether he had a gun and he replied that he did not. The suspect was frisked and, after no gun was found, he was released. *See* Def.Ex. F; Tr. 95–97.

Meanwhile, Officers Murphy, Parco and Pardo had begun following the smaller group of men standing off to the side. This group had started walking away shortly after the police arrived at the park. Tr. 23. Officer Murphy testified that he wanted to follow them because Defendant was "wearing a jacket similar to the one described in the radio run." Tr. 21. The jacket Defendant wore was black and bright yellow, with a single horizontal white stripe in the middle. Def.Ex. B. Black and yellow are the colors worn by the Latin Kings gang. Tr. 77.

As the three police officers followed Defendant and his companions, Officer Murphy saw Detective Thomas Murray patrolling in an unmarked car. Using hand signals, Officer Murphy directed Detective Murray to stop Defendant and the others. Tr. 23. Detective Murray drove his car onto the sidewalk, blocking the group from passing, and ordered them to put their hands against the car. Tr. 24. Officers Murphy, Pardo and Parco then arrived and began frisking Defendant and his companions. Tr. 105, 109.

Officer Murphy testified that as he approached Defendant, he smelled marijuana. Tr. 25. He frisked Defendant along his waistband, the outside of his jacket, and down his pants leg. As he went down the pants leg, he "tapped" on Defendant's pocket and heard a "plasticky" crinkling sound. Tr. 26. Officer Murphy testified that he asked Defendant what was in his pocket and that Defendant replied, "weed." Tr. 26. Officer Murphy then reached inside Defendant's pocket and recovered a small package con-

taining a tiny amount of marijuana. Defendant was then placed under arrest and handcuffed. Tr. 26–27.

Sergeant Loughran and Officer Murphy transported Defendant to the 48th Precinct station house. At the station house, Officer Murphy frisked Defendant again. Tr. 32. Officer Murphy testified that this time he found a large, fully loaded .38 caliber revolver in the crotch area of Defendant's pants. Tr. 33. Sergeant James Roy, who was standing nearby, testified that he saw Officer Murphy recover the gun. Tr. 82. Although he stated that he was alarmed to see a loaded gun found on a prisoner, Officer Roy made no record of the event and did not report it to any supervisor. Tr. 84.[3]

## II. *Discussion*

### A. The *Terry* Stop

■ Defendant contends that the police did not have reasonable suspicion to stop him and that all of the evidence obtained pursuant to this stop must therefore be suppressed.

"A police officer may, in appropriate circumstances and in an appropriate manner, stop a person for purposes of investigating possibly criminal behavior, even though there is no probable cause to make an arrest." *United States v. Bold*, 19 F.3d 99, 102 (2d Cir.1994) (citing *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968)). Such a stop is permissible only if the police have "reasonable suspicion." *Id.* This standard is met where the police are "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that an individual is engaged in criminal activity. *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581–82, 45 L.Ed.2d 607 (1975); *see also United States v. Jaramillo*, 25 F.3d 1146, 1150–51 (2d Cir.1994).

---

**3.** Based on this arrest, the Bronx District Attorney charged Fernandez with criminal possession of a weapon and unlawful possession of marijuana. After he posted bail, his parole was violated as a result of this arrest, and he spent eight months in jail awaiting trial. On February 22,

1996, the prosecution moved to dismiss the charges, concluding that "the People would not be able to sustain our burden at a *Mapp* hearing." Recommendation for dismissal, 2/20/96. The state charges were dismissed and this federal indictment followed.

■ "Reasonable suspicion depends upon both the content of the information possessed and its degree of reliability." *Bold,* 19 F.3d at 102. To determine whether reasonable suspicion exists based upon an informant's tip, courts must look at "the totality of the circumstances—the whole picture." *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990). A police officer's verification of the "innocent" aspects of an anonymous tip "lends support to a reasonable suspicion determination, because it would be reasonable for the police to believe that the allegation of illegality will be true as well." *United States v. Walker,* 7 F.3d 26, 29 (2d Cir.1993), *cert. denied,* 510 U.S. 1169, 114 S.Ct. 1201, 127 L.Ed.2d 549 (1994).

Based on the facts presented here, the police did not have reasonable suspicion to stop Defendant and his companions. The anonymous tip upon which the police acted described only an armed Hispanic man in a white and black jacket. It did not indicate how the caller knew that the individual was carrying a gun, whether the individual described was engaged in any criminal activity, the suspect's age, height, weight or other identifying characteristics, or the caller's relationship to the individual. In fact, the caller even refused to be called back to verify the information he was providing. Tr. 92.

More importantly, independent observation by the police failed to verify the only particularized information contained in the tip. Everyone in the park was an Hispanic male. It is unclear whether anyone there was wearing a black and white jacket. Sergeant Loughran stopped an individual who he testified "somewhat fit the description," but discovered that he did not have a gun. *See* Def.Ex. F; Tr. 95–97. Officer Murphy testified that he stopped Defendant because he was an Hispanic male whose jacket was "similar" to that described by the caller. Tr. 21. However, virtually all members of the Latin Kings are Hispanic males, and Officer Murphy conceded on cross-examination that he would not describe Defendant's jacket as a white jacket with black stripes. Tr. 49. Indeed, even a cursory examination of Defendant's jacket reveals that it is a predominantly black and bright yellow garment, with only a single small white stripe.

The government cites several anonymous-tip cases in support of its contention that it had reasonable suspicion here. However, each of these cases is distinguishable. In *Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), the police received an anonymous tip which provided the suspect's name, the color, make and identifying characteristics of her car, the time she would be leaving a particular address to engage in a drug transaction, and the address where the transaction would occur. Because the police were able to independently corroborate most of the specific details predicted by the informant, the Court found that they had reasonable suspicion to stop the suspect. *Id.* at 331–32, 110 S.Ct. at 2416–17.

*Walker* involved a similarly detailed tip that was substantially corroborated by the police before they approached the defendant. In that case, the tip included information that "a black male, approximately 5'8" to 5'9", approximately twenty-five years old, very large and fat, clean shaven, with short close-cropped hair" would be arriving at Pennsylvania Station in New York City on an Amtrak train coming from the south. *Walker,* 7 F.3d at 27. Upholding the seizure of defendant's luggage, the court noted that "nearly every aspect of the tip" had first been independently verified by the police.[4] *Id.* at 31.

Of the cases cited by the government, *Bold* comes the closest to supporting the search conducted here. In *Bold,* the police received a tip that in the parking lot of a Brooklyn restaurant, there was a four-door gray Cadillac occupied by three black men, one of whom was armed with a gun. The armed man was described as 21 years old and wearing a hooded sweater. When the police arrived, they found a four-door gray Cadillac parked, alone, at the back of the lot. Because the car had darkly tinted windows, the police were unable to see the people inside.

**4.** In *United States v. Place,* 462 U.S. 696, 702, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983), the Supreme Court held that the *Terry* standard applies to the seizure of "personal luggage from the custody of the owner on the basis of less than probable cause."

The officers approached the car, opened its doors, and instructed the two men inside to step out of the car. Inside the car, the police discovered evidence linking the two men to a bank robbery that occurred earlier in the day. *See Bold,* 19 F.3d at 100–01.

In concluding that the police had reasonable suspicion to open the car doors, the court in *Bold* emphasized that the officers had first corroborated the tipster's report of a particular type of car in a particular location. *See Bold,* 19 F.3d at 103–04 ("when verified by the officers, the tipster's information was sufficient under Terry to warrant further investigation"). Further, the court noted that the police had been unable to obtain additional corroboration because of the car's darkly tinted windows, and that the location of the car in a remote part of the lot raised the officers' suspicion of illicit activity. *Id.* at 103. Finally, the court noted that where a tip involves an individual with a gun, the totality of the circumstances test "should include consideration of the possibility of the possession of a gun, and the government's need for a prompt investigation." *Id.* at 104.

The government contends that *Bold* controls the instant case. I disagree. The anonymous tip in this case was far less detailed than that provided in *Bold,* and the police were not able to corroborate the little information it contained. Indeed, the police ultimately stopped an individual who did not fit the only specific characteristic provided by the tipster. Moreover, unlike in *Bold,* here there was nothing suspicious about what the police witnessed. There was no car parked in the back of an empty lot, with darkly tinted windows shielding potentially armed suspects. There was only a group of fifty Hispanic men exercising their First Amendment right to peaceably assemble—in open view—in a public park.[5]

The only way that *Bold* could control the instant case is if it stood for the proposition that whenever the police receive an anonymous tip involving the possession of a gun by a person of a certain race, they may perform a *Terry* stop on any member of that race. I cannot read it to support such a far-reaching and disturbing proposition. Although the possibility that a person has a gun must be considered in evaluating the totality of the circumstances, it does not permit the police to ignore the Fourth Amendment. They must still possess some "specific articulable facts" that warrant suspicion of the individual being stopped. Because I conclude that the police possessed no such facts here, the motion to suppress is granted.

### B. The Search

Even if the police did have reasonable suspicion to stop Defendant, they did not have probable cause to search his pocket for marijuana. The government concedes that under *Minnesota v. Dickerson,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), Officer Murphy would not have had a basis for reaching into Defendant's pocket without his statement that it contained "weed." *See* Government's Second Memorandum of Law in Opposition to Motion to Suppress at 11 n. 6. Officer Murphy's testimony that Defendant made this statement is unconvincing. Indeed, it is contradicted by the "Stop And Frisk Report" Officer Murphy filed. *See* Def.Ex. E. In that report, under the heading "remarks by person stopped," Officer Murphy wrote "none." *Id.* Moreover significantly, under the section where he was asked the basis for conducting a search inside the clothing, he wrote only "strong odor of marijuana." *Id.* He never mentioned Defendant's alleged statement.

Other aspects of this arrest are equally troubling. When Officer Murphy initially frisked Defendant, he did so in a manner thorough enough to uncover a tiny plastic packet of marijuana. It is extremely difficult to believe that the same officer could have

---

5. The government argues that Defendant and his companions "fled" the park when the police arrived, and that this behavior was suspicious. This argument is contradicted by the evidence developed at the suppression hearing. Officer Murphy himself testified that the group was merely "walking" away. Tr. 57. There was no testimony that they ran, or split up to evade the police. Their behavior was hardly akin to the type of "flight" that might raise suspicion. *c.f., United States v. Harley,* 682 F.2d 398 (2d Cir. 1982) (fact that Defendant ran a red light to escape police and drove at 90 m.p.h. for three miles contributed to finding of "reasonable suspicion" for stop).

missed a bulky .38 caliber revolver hidden in Defendant's pants. This raises a serious question as to how and when the gun came into Defendant's possession.[6]

### III. *Conclusion*

For the reasons set forth above, Defendant's motion to suppress both the physical evidence and the statement is granted. A status conference is set for August 29 at 10:30 a.m.

So ordered.

**6.** Defendant alleges that he has been targeted by the police because of his prominent role in the Latin Kings. In addition to the May 12, 1995 incident which is the subject of this motion, Defendant was recently stopped again by the police. While the government contends that there was a valid basis for this stop which can only be disclosed *in camera*, it does appear that Defendant is the subject of close police scrutiny.