**UNITED STATES of America,**

v.

**William COLON, Defendant.**

**No. 00 Cr. 308(LAK).**

United States District Court,
S.D. New York.

Sept. 6, 2000.

Leslie Brown, Assistant U.S. Attorney, Mary Jo White, U.S. Attorney, New York City, for U.S.

Steven Statsinger, Leonard F. Joy, Federal Defender Div., Legal Aid Society, New York City, for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

The Court previously denied defendant's motion to suppress physical evidence and a custodial statement made following his arrest. It now issues this opinion, as the motion raises two significant issues.

### Facts

Defendant was arrested in an after-hours club in the Bronx, as a result of an "anonymous" tip to a 911 operator. On February 6, 2000, shortly after six a.m., a woman called 911 and told the operator that she was in her car outside an after-hours club and that there was a man inside the club who had hit her in the head with a gun. She described him as a white Hispanic wearing a red baseball cap and a red leather jacket who answered to the nickname "White Boy."[1] When asked if she wished to leave her name and number, the caller responded as follows:

> "I don't care because he already hit me one time and Officer Alejandro has my report on him. You know? And, but I just don't want him to know that I was the one that called."[2]

Later, when asked whether she would be there when the police arrived, the caller responded that she was not going to be there because she didn't want White Boy to see her. She said he was a drug dealer and she didn't want to "get killed."[3] The caller repeated that White Boy had hit her in the face approximately three weeks earlier, causing her to need 15 stitches, and that the cops knew about the incident so "I don't have to give you my name. They know who I would be. You understand?"[4] She went on to say:

> "If I leave you my name, and they start saying my name over there. I don't wanna' be, you know, I don't want no problems because I have three children and I don't want to take no kind of risk."[5]

She continued,

> "You understand? It could be like they were just busting the place and he just

---

1. Brown Aff., Ex. A (transcript of 911 call) 1–2.

2. *Id.* at 3.

3. *Id.* at 4–5.

4. *Id.* at 5.

5. *Id.*

happen to have a gun and they're busting him for that. You understand?"[6]

The call ended moments later.

At that point, the operator made an entry in the computer system to transmit the relevant information to a New York Police Department ("NYPD") dispatcher, describing the incident as a code "10–10," which indicates a crime in progress.[7] The operator conveyed the physical description and location of the subject, indicated that he possessed a firearm, and included a Sprint Spectrum cell phone number that the 911 system identified as the number from which the caller placed the call.[8]

The dispatcher then went on the air and called for a patrol car to respond to the after-hours club. The radio transmission from the dispatcher to the patrol unit indicated that it was a "man with a gun case," gave the suspect's description and location, and told the patrol that it was an anonymous tip with no "call-back" at that time.[9] Moments later, the dispatcher reported that the call-back was a cell phone.[10] In due course, the police entered the after-hours club, identified the defendant, patted him down, and discovered a Bryco 9–millimeter semi-automatic pistol at the small of his back, inside his waistband. Defendant was arrested and later gave a videotaped confession in which he admitted that he had possessed the 9–millimeter semi-automatic pistol.

6. *Id.*

7. Mem. of Law in Opposition to Motion to Suppress ("Gov't Mem.") 2.

8. Brown Aff., Ex. B (printout of information sent by the operator to the dispatcher).

9. Brown Aff., Ex. C (transcript of dispatch) 1.

10. *Id.*

11. Def. Mem. in Support of his Motion to Dismiss ("Def.Mem.") 3.

12. *See, Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Tehrani,* 49 F.3d 54, 58 (2d Cir.1995).

13. *Illinois v. Wardlow,* 528 U.S. 119, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000) (quot-

## Discussion

### Reasonable Suspicion

The defendant argues that he was frisked illegally by a police officer, based on an unreliable anonymous tip, in violation of the Fourth Amendment and that the gun and his custodial statements must be suppressed.[11]

▆▆▆ A police officer may not stop a person to investigate possibly criminal behavior without "reasonable suspicion" that criminal activity has occurred or is about to occur.[12] The test for reasonable suspicion is less demanding than the test for probable cause – an officer making such a stop need only "be able to articulate more than an 'inchoate and unparticularized suspicion or 'hunch' of criminal activity.' "[13] Finally, reasonable suspicion, like probable cause, is dependant upon both the content of information possessed by police and its degree of reliability, both of which should be considered in the totality of the circumstances.[14]

### Anonymous Tips

▆▆ When the information giving rise to a reasonable suspicion comes from an anonymous tipster, it is more difficult to gauge both the reliability of the informa-

ing *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1946)); *accord United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (same); *see also United States v. Santana,* 485 F.2d 365, 368 (2d Cir.1973) (test for reasonable suspicion is "rather lenient"), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974).

14. *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). *See United States v. Brignoni–Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (reasonable suspicion arises when law enforcement officers are "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion").

tion and the credibility of the informant.[15] In such cases, "something more" is required – some "indicia of reliability" to corroborate the information and establish the requisite quantum of suspicion.[16]

■ The defendant argues that the tip leading to his arrest was anonymous and that it lacked the requisite indicia of reliability to establish reasonable suspicion to stop and search him. He relies on *Florida v. J.L.*,[17] in which the Supreme Court recently held that an anonymous tip giving the location and description of an individual allegedly carrying a gun but containing "no predictive information" about the subject's future movements left the police "without means to test the informant's knowledge or credibility." [18] In that case, the anonymous tip was held insufficient to justify a stop and frisk.[19] In terms of the quality and reliability of information that the police had by the time the defendant was stopped, however, this case is quite different from *J.L.*

The Court does not regard the call in this case as having been truly anonymous.[20] The caller gave information to the police that she believed would have enabled the police to determine her identity and location. She said that she had made a report of a prior incident and named a police officer who would have knowledge of that report.[21] At another point in the conversation, she said that the police would know about it and know who she was.[22] The critical point for purposes of this determination is that the caller gave information which, on the face of it, indicates that she believed she was identifiable to the police. That distinguishes this case from *J.L.*, and adds to the reliability of the tip because she subjected herself to the risks of adverse consequences in the event that the tip proved to be false.[23]

Furthermore, the caller made it clear that she had a very sound reason for refusing to give her name during the 911 call, despite the fact that she believed that the police, in due course, could track her down. According to the 911 call, the defendant had hit the caller twice – once requiring 15 stitches and once hitting her in the head with a gun. Her expressed concern was the fear that if her name was used in the 911 call, it would come to the attention of the officers responding to the call and could be mentioned in the course of the arrest, resulting in reprisals against her.[24]

There are two additional, relevant facts, one of which clearly distinguishes this case from *J.L.* and the other of which appears to do so. First, unlike *J.L.*, this 911 call and, indeed, all of the communications that flowed from it, were recorded.[25] Thus,

---

**15.** *See, e.g., White*, 496 U.S. at 329, 110 S.Ct. 2412 ("an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity").

**16.** *See id.* at 329–31, 110 S.Ct. 2412; *Illinois v. Gates*, 462 U.S. 213, 227, 237–38, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

**17.** 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000).

**18.** *Id.* at 1379.

**19.** *Id.* at 1380.

**20.** *See id.* at 1381 (Kennedy, J., concurring) ("It seems appropriate to observe that a tip might be anonymous in some sense yet have certain other features, either supporting reliability or narrowing the likely class of infor-

mants, so that the tip does provide the lawful basis for some police action.").

**21.** Brown Aff., Ex. A, 3.

**22.** *Id.* at 5. As it turned out, the call also proved to be traceable via caller I.D., although there is no reason to rely on the caller knowing that would be the case.

**23.** *See Florida v. J.L.*, 529 U.S. at —, 120 S.Ct. at 1381 (Kennedy, J., concurring) ("If an informant places his anonymity at risk, a court can consider this factor in weighing the reliability of the tip.").

**24.** Brown Aff., Ex. A, 5.

**25.** *See Florida v. J.L.*, 529 U.S. at —, 120 S.Ct. at 1377 ("So far as the record reveals, there is no audio recording of the tip, and nothing is known about the informant.").

this case does not deal with an attempt to reconstruct a series of hurried communications, the nuances of which are important but very difficult to reconstruct after the fact. This lends strength to the Court's conclusion about whether there was reasonable cause. Second, here it is crystal clear that the caller had first hand knowledge of the alleged criminal activity. In *J.L.*, on the other hand, it was not clear that the caller had a comparable basis for the information he imparted.[26]

In all of the circumstances, therefore, the Court has no doubt that the tip provided adequate first hand knowledge of a crime and was sufficiently reliable to establish reasonable cause to stop and search the defendant. It follows, therefore, that if the call had been received by a police officer, there was reasonable cause under the principle of collective, or imputed, knowledge to stop and search the defendant. This principle is based on the idea that whatever is known to any police officer working on a matter is imputed to the others and, in consequence, the officers who went into the after-hours club on that hypothesis would have had reasonable cause for a *Terry* stop.[27]

*Imputing Knowledge from a 911 Operator to the Police*

■ The defense challenges the propriety of imputing knowledge from a 911 operator to a police officer, arguing that even if the operator had sufficient information to establish reasonable suspicion to stop and search the defendant, the police did not.[28] The defense would measure the existence of reasonable cause solely on the basis of what was communicated over the radio between the police dispatcher and the responding officers. The law of collective, or imputed, knowledge does not, however, put the Court in quite that straitjacket.

Although the doctrine is sometimes referred to as the "fellow officer rule"[29] and often is invoked to impute knowledge from one police officer to another,[30] courts also have applied the rule more broadly, referring to the collective knowledge of "law enforcement authorities,"[31] a "large police organization,"[32] or a police department generally.[33] The particular verbal formulations used appear to reflect the facts of given cases, with courts simply describing the situations before them, sometimes us-

**26.** See *Illinois v. Gates*, 462 U.S. at 230, 103 S.Ct. 2317 (abandoning the *Aguilar–Spinelli* test for probable cause, but making clear that an informant's veracity, reliability, and basis of knowledge remain highly relevant).

**27.** See, e.g., *United States v. Hensley*, 469 U.S. 221, 230–31, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *Illinois v. Andreas*, 463 U.S. 765, 772 n. 5, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983) ("[W]here law enforcement authorities are cooperating in an investigation, as here, the knowledge of one is presumed shared by all."); *Whiteley v. Warden*, 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971) ("To prevent arresting officers from acting on the assumption that fellow officers who call upon them to make an arrest have probable cause for believing the arrestees are perpetrators of a crime would, it is argued, unduly hamper law enforcement."); see also *Terry*, 392 U.S. at 30, 88 S.Ct. 1868 (when officer has reason to believe that a suspect is armed and presently dangerous, "he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of [the suspect] in an attempt to discover weapons which might be used to assault him.").

**28.** Def. Mem. 5–6.

**29.** See, e.g., *Karr v. Smith*, 774 F.2d 1029, 1031–32 (10th Cir.1985).

**30.** See, e.g., *United States v. Nafzger*, 974 F.2d 906, 912 (7th Cir.1992) ("It is not unusual, much less improper, for the collective knowledge doctrine to be applied in cases such as this, where one police officer acts based on information provided by another officer who is not at the scene.").

**31.** *Illinois v. Andreas*, 463 U.S. at 771 n. 5, 103 S.Ct. 3319.

**32.** *United States v. Del Porte*, 357 F.Supp. 969, 974 (S.D.N.Y.), *aff'd sub nom.* *United States v. St. Jean*, 483 F.2d 1399 (2d Cir.1973).

**33.** *United States v. LaVallee*, 379 F.Supp. 111, 115 (S.D.N.Y.1974).

ing "police officers" and sometimes using an auxiliary, depending on who is involved.

One exception to this is *United States v. Santa,*[34] in which the Second Circuit stated that knowledge may be imputed only from one police officer to another who is working on the same case.[35] *Santa* was, however, an odd case. Santa was arrested after the *vacatur* of his warrant, notice of which had been mistakenly sent to the arresting police department 17 months earlier.[36] The court found that a desk clerk's "knowledge" – garnered from the correspondence received in error – should not *ipso facto* be imputed to the arresting officers.[37] Because of these unique facts, *Santa* does not have much bearing here.

The ultimate question, in light of the Fourth Amendment, is one of reasonableness. The defense argues that police officers are trained and have developed skills that provide them with a basis for assessing probable or reasonable cause that civilian employees of a police department, including 911 operators, should not be assumed to possess. This is probably true, but does not make a great deal of difference. The imputed knowledge cases turn not on the characteristics of the personnel among whom knowledge is imputed, but rather involve practical assessments driven by the overall requirement of reasonableness. The practical necessity of imputing knowledge among law enforcement personnel is significant – those involved in an investigation cannot reasonably be expected to spend a great deal of their time repeating to every officer who may make a stop or arrest all of the facts and information known to each and every member of the law enforcement team.[38] If the Constitution so required, it would bring to mind Dickens' comment attributable to Sergeant Bumble about the law being an ass.[39] Given this reality, the Supreme Court has come to the view that an arrest or a stop and search is valid if law enforcement authorities as a whole have probable or reasonable cause because that is the only way the system can work effectively. As the D.C. Circuit stated in *Williams v. United States,* a case subsequently followed by our Circuit,[40]

"[I]n a large metropolitan police establishment the collective knowledge of the organization as a whole can be imputed to an individual officer when he is requested or authorized by superiors or associates to make an arrest. The whole complex of swift modern commu-

---

**34.** 180 F.3d 20 (2d Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 356, 145 L.Ed.2d 278 (1999).

**35.** *Id.* at 27–28 (interpreting Supreme Court's language in *Whiteley,* 401 U.S. at 568, 91 S.Ct. 1031).

**36.** *Id.* at 22–23. Notice of the request to vacate was supposed to have been sent to a different police department, which was the complaining law enforcement agency, in order for it to vacate the warrant and have it deleted from a statewide computer database. *Id.*

**37.** *Id.* at 28. The police department did not act upon or enter the misdirected *vacatur* request into its internal computer system. Rather, the department returned it to the court from which it was erroneously issued – a practice the Second Circuit found was not unreasonable as a matter of law. *Id.* at 29.

**38.** *See United States v. Valez,* 796 F.2d 24, 28 (2d Cir.1986), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 957, 93 L.Ed.2d 1005 (1987) ("The rule that permits courts to assess probable cause to arrest by looking at the collective knowledge of the police force – instead of simply looking at the knowledge of the arresting officer .... exists because, in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates.").

**39.** *See* Charles Dickens, Oliver Twist, Ch. 23 (1837–39).

**40.** *United States v. Canieso,* 470 F.2d 1224, 1230 n. 7 (2d Cir.1972) (quoting *Williams v. United States,* 308 F.2d 326 (D.C.Cir.1962)); *see also Calamia v. City of New York,* 879 F.2d 1025, 1032–33 (2d Cir.1989) (quoting *Illinois v. Andreas,* 463 U.S. 765, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983), and imputing knowledge from assistant District Attorney to arresting police officer).

nication in a large police department would be a futility if the authority of an individual officer was to be circumscribed by the scope of his first hand knowledge of facts concerning a crime or alleged crime."[41]

This Court holds that *Williams* applies to the facts of this case. New York is an enormous city. The police department decided years ago that it did not make sense to have highly trained and costly police officers as telephone operators and so hired somewhat cheaper personnel to handle that task, putting police officers back on the street where they belong. Given the huge volume of traffic through the 911 response center, it is hard to imagine the system working any other way in an economically rational universe.

As stated previously, there is no doubt that the stop here would have been valid if the caller in this case had spoken with a police officer. Given the realities of law enforcement in New York City in the year 2000, the Court does not believe that the Constitution requires a different outcome simply because a police officer did not answer the telephone. This is not to say that the Constitution applies differently to a big city than to any other. It is only to recognize that what may be practical in a smaller city may not be practical here and, therefore, that what is reasonable here may differ from what is reasonable elsewhere. The stop in this case was reasonable. In consequence, defendant's motion to suppress was denied.

SO ORDERED.

---

**41.** 308 F.2d 326, 327 (D.C.Cir.1962).