**UNITED STATES of America,
Plaintiff,**

v.

**Tarrick PERSON, Defendant.**

**No. 00 CR 734 NG RML.**

United States District Court,
E.D. New York.

March 7, 2001.

Assistant U.S. Attorney David M. Spring, U.S. Attorney Loretta Lynch, Brooklyn, NY, for plaintiff.

Roger Bennet Adler, PC, New York City, for defendant.

## ORDER

GERSHON, District Judge.

Defendant's motion to suppress evidence was referred to the Honorable Robert M. Levy, Magistrate Judge, who, in a Report and Recommendation dated January 17, 2001, found that the motion should be granted. Following the government's objection to the Report, I have reviewed the motion de novo, and heard oral argument. I now adopt Judge Levy's Report in its entirety.

Judge Levy thoroughly analyzes the facts, which are not disputed, and the applicable law, and he comprehensively addresses the subtle factual issues that can make the difference between reasonable suspicion and its absence.

 I write only to emphasize the absence in this case of the corroboration of illegality required of anonymous tips by the Supreme Court's recent, unanimous decision in *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). It is true, as the government argues, that, in this case, unlike in *J.L.,* the anonymous caller indicated the basis for her knowledge, namely, her own observations of someone in possession of a weapon in a restaurant, and that the call was traced to a payphone diagonally opposite the restaurant where the caller said the weapon was being possessed, which provided some corroboration of her ability to observe what she reported. However, this does not take the case out of the strictures of *J.L.,* which held that "a tip [must] be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272, 120 S.Ct. 1375. The location of the payphone provides insufficient corroboration that the assertion of illegality was reliable. As Judge Levy sets out, and as is undisputed, the police did not corrobo-

rate that the defendant was engaged in illegal conduct before they stopped him and asked him to stand and raise his arms. They saw no suspicious conduct of any kind or degree. Indeed, what they observed was that he was engaged in the wholly innocuous conduct of eating a hamburger at a counter. As the Supreme Court in *J.L.* emphasized, an anonymous tip does not become reliable just because it accurately describes the defendant and the defendant's current location. The assertion that the defendant is engaged in criminal activity must also be reliable. That was missing here.

I agree with the government's observation, in its most recent submission to the court, that "Public safety necessitates that the police immediately investigate allegations of gun possession and take reasonable steps to protect themselves and the public." Nonetheless, *J.L.* requires suppression of a gun where the police stop a defendant based on the call of an unknown informant, who will not be accountable for her call, and whose assertion of illegality is not corroborated.

The motion to suppress the gun seized from the defendant and his post-arrest statements is granted.

## SO ORDERED.

## *REPORT AND RECOMMENDATION*

LEVY, United States Magistrate Judge.

By order dated August 1, 2000, the Honorable Nina Gershon, United States District Judge, referred this matter to me for a report and recommendation on defendant's motion to suppress. For the reasons stated below, I respectfully recommend that defendant's motion be granted and that the handgun and defendant's subsequent statements to law officers be suppressed.

## BACKGROUND AND FACTS

Defendant Tarrick Person ("Person" or "defendant") brought this motion on August 1, 2000 pursuant to Rules 12(b)(3) and 41 of the Federal Rules of Criminal Procedure, alleging that the stop and search of his person were unreasonable and violated his Fourth Amendment rights. Defendant seeks to suppress the seized handgun found in his possession by officers of the New York City Police Department ("NYPD") and any post arrest statements pursuant to the "fruit of the poisonous tree" doctrine.

Defendant was arrested on May 19, 2000 by NYPD officers and charged by the Kings County District Attorney with Criminal Possession of a Weapon in the Third Degree, in violation of New York State Penal Law § 265.02(4). (Defendant Tarrick Person's Memorandum of Law in Support of His Pre–Trial Motions ("Dft's Mem.") at 2). On June 12, 2000 Person was arrested pursuant to 18 U.S.C. § 922(g)(1), and charged with being a felon in possession of a firearm that had been shipped and transported in interstate or foreign commerce. On July 11, 2000 Person was indicted by a Grand Jury in the Eastern District of New York for this same charge. At a status conference held on August 1, 2000, Judge Gershon ordered that defense motions be filed by September 29, 2000, and directed me to set any further schedule.

I held a suppression hearing on November 8, 2000, and following the hearing I directed the parties to submit supplemental briefs by November 15, 2000. The government requested an extension of time and submitted its Memorandum of Law in Opposition to Defendant Person's Motion to Suppress ("Govt's Mem.") on November 20, 2000. Defendant submitted his reply letter on November 29, 2000.

Defendant was arrested in Billy's Restaurant on Lewis Avenue in Brooklyn, as a result of an anonymous tip to a 911 operator. On May 19, 2000, at approximately 2:00 p.m., a woman called 911 and told the operator that a man with a gun was in the vicinity of Halsey Street and Lewis Avenue. She described him as a tall, light-skinned black male, heavyset, wearing a black leather jacket. (Transcript of Criminal Cause for Suppression Hearing, November 8, 2000 ("Tr.") at 9.) She stated, "it's a guy in a restaurant and he has a gun, like he's here to stick up the restaurant." (Transcript of Criminal Cause for Telephonic Recording Before Robert M. Levy, United States Magistrate Judge, New York City Police Department Communications Division, Tape Unit Job # 24070, Government's Ex. 4 ("Govt.Ex.4") at 2.) The caller also told the 911 operator "he's standing there with the gun. He keeps taking the gun in and out of his pocket." (*Id.* at 3.) The caller declined to identify herself and hung up.

The dispatcher then called for a patrol car to respond to the location. The radio transmission from the dispatcher to the patrol unit told the responding officers that a man with gun was possibly going to rob a restaurant. (*Id.* at 4; Tr. at 9.) The dispatcher also gave the suspect's description (Govt.Ex. 4 at 4; Tr. at 9) and reported that the information came from a call to 911 that was traced to a pay phone in front of a grocery store at 331 Lewis Avenue, diagonally across the street from Billy's Restaurant. (Govt.Ex. 4 at 4; Tr. at 11–12.)

Approximately two minutes later officers Leslie Simonson Moore and Tracey Ragsdale responded to Billy's Restaurant in a squad car. The officers did not look at the pay phone where the call originated but went directly to the restaurant. (Tr. at 42.) The officers found no one matching the description outside the location, but inside the restaurant they saw a res-

taurant employee behind the counter and a customer seated at the counter eating a hamburger (*Id.* at 14–16, 51–52.) The customer, the defendant, was a light-skinned, heavyset black male wearing a dark leather jacket. (*Id.* at 13.) The two officers entered the location and asked the defendant to do them "a favor" and put the hamburger down, stand, and raise his hands. Once he was standing, the officers noticed that one side of his jacket hung lower than the other, and one of the officers circled behind the defendant and looked inside the jacket pocket. (*Id.* at 17.) The officer observed a handgun and arrested the defendant. A search revealed that the defendant possessed a Smith & Wesson .357 caliber revolver. (*Id.* at 54.) A subsequent search found no one near the pay phone from which the 911 call had been made, thus rendering the identity of the caller untraceable. (*Id.* at 19.)

In his motion, defendant argues that the police stopped and frisked him illegally based on an unreliable anonymous tip, in violation of the Fourth Amendment, and that the gun and his custodial statements must be suppressed. (Dft's Mem. at 4–5.) The government responds that the police actions did not violate the Fourth Amendment because the police intrusion was "minimal" and "justified" in that "the police were investigating the defendant's possession of a deadly firearm, as well as the possibility that the defendant may have been about to commit a robbery." (Govt's Mem. at 14.) In addition, the government argues that the record of the 911 call and the fact that the call was traced to a public telephone provided the tip with sufficient reliability to allow the stop of Person under the Fourth Amendment. (Govt's Mem. at 6, 9–10.)

### DISCUSSION

■ A police officer's investigatory stop must be founded upon "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.' " *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *see also United States v. Tehrani,* 49 F.3d 54, 58 (2d Cir.1995). Reasonable suspicion can be found when an officer or agent is in "possession of 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.' " *United States v. Villegas,* 928 F.2d 512, 516 (2d Cir.1991) (quoting *Terry,* 392 U.S. at 21, 88 S.Ct. 1868).

■ "Although the level of suspicion for a Terry stop is considerably less than proof of wrongdoing by a preponderance of the evidence, the Fourth Amendment still requires some minimal level of objective justification for making the stop." *United States v. Floyd,* No. 99–CR–234, 1999 WL 673050, at *6 (S.D.N.Y. Aug.30, 1999) (citing *Alabama v. White,* 496 U.S. 325, 329–30, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)). The officer conducting the investigatory stop "must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch." ' " *Sokolow,* 490 U.S. at 77, 109 S.Ct. 1581 (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868). "Reasonable suspicion is a less demanding standard than probable cause ... [and] can arise from information that is less reliable than that required to show probable cause." *White,* 496 U.S. at 330, 110 S.Ct. 2412. However, like probable cause, reasonable suspicion "is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the 'totality of circumstances—the whole picture.' " *Id.* (quoting *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

In the case of a police investigatory stop based on a tip, the Supreme Court has stated that "if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Id.* The Court in *White* noted that it had previously upheld the stop and frisk in *Terry* based on a tip given "in person by a known informant," which gave the tip sufficient "indicia of reliability." *Id.* at 328, 110 S.Ct. 2412 (citing *Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)).

■ The difficulty of determining the reliability of information and the credibility of the informant increases in the anonymous tip situation. *See United States v. Colon,* 111 F.Supp.2d 439, 441–42 (S.D.N.Y.2000). "[A]n anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *White,* 496 U.S. at 329, 110 S.Ct. 2412. Thus, the anonymous tip must provide *"sufficient indicia of reliability* to provide reasonable suspicion to make the investigatory stop." *White,* 496 U.S. at 327, 110 S.Ct. 2412 (emphasis added).

Defendant argues that the tip leading to his stop and subsequent arrest came from an anonymous source and lacked the requisite indicia of reliability to provide reasonable suspicion for the stop and search. (Deft's Mem. at 5.) He relies on *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), in which the Supreme Court recently addressed the reliability of an anonymous tip reported to the Miami-Dade police that a "young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.,* 120 S.Ct. at 1377. No audio recording existed of the tip, and the police knew nothing about the informant. Two officers responded to the tip and found three black males standing at the bus stop. One of the three, J.L., was wearing a plaid shirt. "Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct. The officers did not see a firearm, and J.L. made no threatening or otherwise unusual movements." *Id.* One of the officers approached J.L., told him to put his hands up, frisked him, and seized a gun from him. The second officer frisked the other two individuals and found nothing.

The Supreme Court held that an "anonymous tip that a person is carrying a gun is not, without more, sufficient to justify a police officer's stop and frisk of that person." *Id.* at 1376. The Court concluded that the report of a man with a gun did not provide the officers with the required indicia of reliability because

> the anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting J.L. of engaging in unlawful conduct.

*Id.* at 1379. *J.L.* emphasized that "[a]ll the police had to go on in this case was the bare report of an unknown, unaccountable informant...." *Id.* Thus, the Court fund the search unreasonable. The Court explained that it feared a caller who could be fabricating and who would never be held accountable for his or her lie. *Id.* at 1378–79.

The government argues that this case is more in line with *Alabama v. White,* which the Supreme Court characterized as a "close case." *White,* 496 U.S. at 332, 110 S.Ct. 2412. In *White,* the police received an anonymous tip regarding a woman carrying drugs. The caller provided predictive information, including the time the

woman would leave an apartment building, get into a particular car, and drive to a named motel. *Id.* at 327, 110 S.Ct. 2412. The Court found this information alone insufficient to justify a *Terry* stop. *Id.* at 332, 110 S.Ct. 2412. However, the Court upheld the stop because the police officers corroborated the caller's information after conducting surveillance of the woman. "When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop." *Id.*

Like *White*, this case is a "close case," but the anonymous informant here did not provide the type of detailed predictive information that bolstered the caller's credibility in *White*. Nor did the police here conduct any surveillance or make any attempt to corroborate the caller's statements before stopping Person. This case is thus closer in line with *J.L.* than with *White*.

 The government acknowledges that in this case, "the caller did not place her anonymity and credibility at risk in a manner similar to a face to face infor-

mant." (Govt's Mem. at 10.) Moreover, it is undisputed that Person's actions were, by themselves, wholly innocuous. He was sitting at the counter in a coffee shop calmly eating a hamburger when the officers interrupted him and directed him to stand and raise his hands.[1] He was alone, and the police did not observe him reaching into his pocket or engaging in any behavior that the officers could have considered suspicious, threatening, or strange. In short, absent the anonymous tip, the officers would have had no reason whatsoever to suspect him of criminal activity. Thus, the court's entire inquiry turns on the reliability of the tip.

As in *J.L.*, the tip here comes from a completely anonymous person and proved reliable in the limited sense that it helped "the police correctly identify the person whom the tipster" meant to accuse. *J.L.*, 120 S.Ct. at 1379. However, the tip did not provide the requisite reliability that the tipster had knowledge of illegality. *Id.* The tipster said "he has a gun, like he's here to stick tip the restaurant" and also told the 911 operator "he is standing there with the gun. He keeps taking the gun in and out of his pocket." (Govt.Ex. 4 at 2–

---

1. The government argues that "[t]he only police action taken that required some suspicion, was asking the defendant to raise his hands. Asking the defendant to stand certainly cannot be viewed as an action which restrains the defendant's freedom in any manner sufficient to impact his Fourth Amendment rights." (Govt's Mem. at 13.) The court disagrees. When the two uniformed officers entered the restaurant and demanded that the defendant put down his hamburger, raise his hands, and stand they specifically engaged in a police investigatory stop implicating the Fourth Amendment. Regardless of how "politely" they asked, no reasonable person would believe he was free to leave in such a situation. *See Terry*, 392 U.S. at 16, 88 S.Ct. 1868 ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person"); *United States v. Men-*

*denhall*, 446 U.S. 544, 554–55, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) ("We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.") (citing *Terry*, 392 U.S., at 19 n. 16, 88 S.Ct. 1868; *Dunaway v. New York*, 442 U.S. 200, 207, and n. 6, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); and 3 W. LaFave, Search and Seizure 53–55 (1978)).

3.) Both of these statements point to potential illegal activity. However, the Supreme Court has stated, "[t]he mere fact that a tip, if true, would describe illegal activity does not mean that the police may make a Terry stop without meeting the reliability requirement." *Id.* at 1380, n. *.

The reliability of a tip can be ascertained either by identifying the caller, and thus rendering the call not truly anonymous, or by independent police corroboration of the tip. In *United States v. Colon,* the district court determined that a call reporting a man with a gun in a club was not truly anonymous because the caller provided information that enabled the police to determine her identity and location. *Colon,* 111 F.Supp.2d at 442. The caller "said that she had made a report of a prior incident and named a police officer who would have knowledge of that report." *Id.*[2] The court also noted that the call was placed from a cellular phone and was traceable via caller I.D. *Id.; see also United States v. Hoskie,* No. 99–CR–128, 2000 WL 1052022, at *7–8 (D.Conn. July 26, 2000) (deciding not to suppress handgun where caller was not anonymous because she identified herself to police by name and telephone number).

The government argues that the record of the call and the caller's seemingly first-hand knowledge of potential criminal activity both distinguish the instant case from *J.L.* and bring it more in line with *Colon.* (Govt's Mem. at 6.) This argument is without merit. In *Colon,* the court first determined that the caller had provided sufficient information to trace her identity before it noted that the record of the call and the caller's first-hand account of the events distinguished that case from *J.L. See Colon,* 111 F.Supp.2d at 442–43. By providing that information, the tipster in *Colon* put her credibility at risk. Here,

by contrast, the caller provided no information that could lead to her identification. Plus, the police traced the call to a public telephone. Thus, the police knew of the diminished opportunity to find or identify the caller, as compared to the situation of a person calling from a non-public location. By the time the officers checked the caller's location, the person had left and the police could not ascertain the caller's identity. (Tr. at 19.) Although the police recorded the call and the caller's report indicated that she gave a first-hand account of the events she witnessed, facts which do create a slight distinction from *J.L.,* these facts do not provide the same reliability as a call traced to an identified person, nor do they give the tipster's account any independent reliability. The officers' suspicion of illegal activity arose not from their observations but only from information provided by an unknown caller. *See J.L.,* 120 S.Ct. at 1378. As in *J.L.,* the tipster here remains anonymous.

■ Even where a tip is wholly anonymous, however, it can be found independently reliable by police verification of the tipster's predictive information. *See White,* 496 U.S. at 332, 110 S.Ct. 2412; *J.L.,* 120 S.Ct. at 1378. In *White,* the police verified an anonymous caller's predictive information, namely the suspect's future movements. In *J.L.,* however, the anonymous tipster provided no predictive information. *See J.L.,* 120 S.Ct. at 1378. The Court stated that "[t]he reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." *Id.* Since the officers in *J.L.* did not have detailed predictive information to corroborate, the police were left "without means to test the

---

2. The caller indicated that Officer Alejandro already had her report about a previous as-

sault by the defendant against the caller. *See Colon,* 111 F.Supp.2d at 440.

informant's knowledge or credibility" and the search was unreasonable. *Id.* at 1379.

Four years after *White* and six years before *J.L.*, the Second Circuit extended *White* to allow a *Terry* stop based on an anonymous tip even where "the anonymous tipster ... did not predict future events, but instead advised the police of a present situation." *United States v. Bold,* 19 F.3d 99, 103 (2d Cir.1994). The court also stated, "[t]here was no need here for any predictions of future conduct, because when verified by the officers, the tipster's information was sufficient under *Terry* to warrant further investigation." *Id.* at 103–04. *Bold* held that *White* did not preclude the authorities from "acting on an anonymous tip when the information to be corroborated refers to present rather than future actions." *Id.* at 104. *Bold,* a case similar to both the instant case and *J.L.,* involved an anonymous caller who provided the police with a report of a man armed with a gun. *See Bold,* 19 F.3d at 100.

The police "corroborated the tipster's report of a particular type of car ... in a particular [and unusual] location," thus supporting the reliability of the tip. *Id.* at 103. The court held that

the police officers' independent corroboration of the anonymous tipster's information, the unusual location of the car in the parking lot, and the inability of the officers to see in the darkly tinted car windows, when combined with the report of a firearm in the car, provided a sufficient basis under *Terry* for the officers to further investigate by opening the car doors and requesting the occupants to get out for questioning.

*Id.*

 To the extent that *Bold* remains good law after *J.L.,*[3] it must be interpreted to mean that reasonable suspicion can be based on either a corroborated anonymous tip which verifies predicted future events, as in *White,* or on a tip involving a present situation, which the police independently corroborate.[4] "Both types of corrobora-

---

**3.** Not every holding in *Bold* withstood *J.L.* In *Bold,* the court distinguished the drug deal in *White* from the tip of "a man with a gun." *Bold,* 19 F.3d at 104.

> The distinction is significant and important: the element of imminent danger distinguished a gun tip from one involving possession of drugs.... Where the tip concerns an individual with a gun, the totality-of-circumstances test for determining reasonable suspicion should include consideration of the possibility of the possession of a gun, and the government's need for a prompt investigation.

*Id.* Relying on *Bold,* the government argues that the "minimal police intrusion here was justified even if this court finds a level of suspicion less than that involved in *White*" because of the presence of a firearm. (Govt's Mem. at 14.) However, the Court in *J.L.* specifically declined to adopt the "firearm exception" that *Bold* upholds. *See J.L.,* 120 S.Ct. at 1379. The Court found that "[s]uch an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anony-

mous call falsely reporting the target's unlawful carriage of a gun." *Id.* at 1379–80.

**4.** The court in *Hoskie* points to *United States v. Canfield,* 212 F.3d 713 (2d Cir.2000), as supporting the continuing validity of present situation tips. *See Hoskie,* 2000 WL 1052022, at *7. The court in *Canfield* vacated a suppression order where omissions from a search warrant affidavit were found immaterial to the probable cause determination. The Second Circuit suggested that because the veracity of an anonymous tip is assessed in the same manner for both reasonable suspicion and probable cause determinations, such tips should be believed if corroborated, even if the tip does not provide predictive information that would establish a track record to prove the informant's truthfulness. *See Canfield,* 212 F.3d at 719–21.

In *Hoskie,* in addition to finding that the tip was not anonymous, the court found that the police corroborated the tip by independently observing suspicious behavior. *Hoskie,* 2000 WL 1052022, at *9. No such observations were made here.

tion require the police to verify the alleged illegality, not just the suspect's identity." *Hoskie,* 2000 WL 1052022, at *6 (citing *J.L.,* 120 S.Ct. at 1379).[5]

As in *J.L.,* the police in this case based their actions on a call from an unaccountable informant who did not put her credibility at risk and whose information arose solely from her uncorroborated first person account. As in *J.L.,* the caller provided no basis for the police to believe she had inside information. Even if the tipster's statements, "it's a guy in a restaurant and he has a gun, like he's here to stick up the restaurant" (Govt.Ex. 4 at 2) and "he keeps taking the gun in and out of his pocket" (*Id.* at 3) did constitute a report of a presently occurring criminal

event, the police were required to corroborate the unknown tipster's information before stopping Person.[6] However, the police made no attempt to corroborate the caller's information before they confronted him. They arrived at Billy's restaurant and happened upon a peaceful scene inside the restaurant with one person seated and another behind the counter. (Tr. at 13.) The suspect did not pose a threat and appeared to be a customer who was about to eat a sandwich. (Tr. at 14.) The police spoke to no one either on the street or in the restaurant before they stopped Person and demanded that he put down his food and raise his hands.[7] (Tr. at 22–25, 32.)

The government contends that the police corroborated the anonymous telephone call

5. Indeed, although not mentioned in the Supreme Court's *J.L.* opinion, the Florida Supreme Court took pains to distinguish *Bold,* by stating that for presently occurring tips, "the independent police investigation would have to uncover something more than just a verification of the innocent details. The police must observe additional suspicious circumstances as a result of the independent investigation." *J.L.,* 727 So.2d 204, 207 (Fla. 1998).

6. The government makes much of the fact that the anonymous caller in the instant case purported to have first-hand knowledge in her report to the police (Govt's Mem. at 5–6), whereas in *J.L.,* the caller did not state the basis of his or her knowledge of the events reported. *See J.L.,* 120 S.Ct. at 1379. However, as explained above, the Supreme Court's concern in *J.L.* was with an anonymous caller whose veracity could not be checked and whose account was uncorroborated. This fact, therefore, does not change the analysis or distinguish the present case from *J.L.*

7. Officer Moore testified that Billy's Restaurant was in a "high crime" area. (Tr. at 10–11.) As an initial matter, that contention is uncorroborated, since there is no other evidence in the record to show that the crime rate in that area of Brooklyn is higher than that in other New York City neighborhoods. Moreover, even when it can be shown that criminal activity is more prevalent in one area

than in others, courts are extremely reluctant to acknowledge this as a factor in determining whether the standards for an investigatory stop are satisfied. *See Maryland v. Buie,* 494 U.S. 325, 334 n. 2, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) ("Even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted"); *United States v. Sprinkle,* 106 F.3d 613, 617 (4th Cir.1997) (" 'Were we to treat the dangerousness of the neighborhood as an independent corroborating factor, we would be, in effect, holding a suspect accountable for factors wholly outside his control' ") (quoting *United States v. Perrin,* 45 F.3d 869, 873 (4th Cir. 1995)); *United States v. Magda,* 547 F.2d 756, 764 (2d Cir.1976) (Motley, J., dissenting) ("The reason why the crime rate in a particular New York City area should be used with the utmost caution is straightforward: even in such an area very few of the thousands of people who live in or pass by the area are actually involved in crime"); *Floyd,* 1999 WL 673050, at *6–8 (fact that *defendant* was walking in a high crime neighborhood at a late hour did not establish reasonable suspicion). Thus, a high crime designation is meaningless absent additional facts that would lead one to suspect that criminal activity is afoot.

by tracing it to a pay phone across the street from Billy's Restaurant. (Govt's Mem. at 8–9.) The prosecution points to Justice Kennedy's concurrence in *J.L.*, which stated that "the ability of the police to trace the identity of anonymous telephone informants may be a factor which lends reliability to what years earlier, might have been considered unreliable anonymous tips." *J.L*, 120 S.Ct. at 1381. The government also argues that the location of the call enhances the reliability of the tip because the caller was positioned to observe the defendant while he was in the restaurant and likely witnessed defendant's actions as she placed the call. (Govt's Mem. at 9.) In addition, the government claims that by choosing to call from a pay phone across the street she increased her risk of identification and retribution, thus adding to the reliability of the phone call. (*Id.* at 10.)

The fact that the tip is traceable to a pay phone across the street does not provide the needed police corroboration to create reasonable suspicion. The caller in this case did not reveal her location and had no reason to believe that her call was being traced. The Kennedy concurrence in *J.L.* appears to envision the kind of circumstances similar to *Colon*, in which the police traced a seemingly anonymous call to a particular cellular phone, and does not speak to the case before us. Although the call was traced to a particular location, the police still did not know the caller's identity, and the person remains unaccountable for her statements. As Justice Kennedy pointed out, "[i]f the telephone call is truly anonymous, the informant has not placed his credibility at risk and can lie with impunity." *J.L.*, 120 S.Ct. at 1381.

To be sure, *J.L.* does not stand for the proposition that every anonymous tip must be corroborated before the authorities take action. The Court stated, "we do not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm before the police can constitutionally conduct a frisk." *Id.* at 1380. Thus, imminent danger would warrant a stop based on an unverified anonymous tip. However, this is not such a case. The tip here involved little more than a general description and the allegation of gun possession. Person presented no apparent threat to the officers when they arrived at the scene, and the government does not argue that he posed the type of risk of imminent danger described in *J.L.* The record indicates that the police officers made no attempt to corroborate any of the tipster's information. Because the officers did not have reasonable suspicion of illegal activity from a reliable source, the search and seizure violated Person's Fourth Amendment rights, and the handgun should be suppressed.

■ Person's post-arrest statements should also be excluded because of the impropriety of the original stop and the violation of his Fourth Amendment rights. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (holding that evidence and witnesses discovered as a result of a search in violation of the Fourth Amendment must be excluded from evidence. The *Wong Sun* or "fruit of the poisonous tree" doctrine applies as well when the fruit of the Fourth Amendment violation is a confession); *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Morales v. New York*, 396 U.S. 102, 90 S.Ct. 291, 24 L.Ed.2d 299 (1969). *See also United States v. Tucker*, 610 F.2d 1007, 1010 (2d Cir.1979). Because the government did not have probable cause for the original stop of Person, I respectfully recommend that any subsequent statements, including voluntary statements by the defendant, be suppressed.

**528**

## CONCLUSION

For the foregoing reasons, I respectfully recommend that the handgun found on Tarrick Person and his subsequent statements be suppressed. Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with courtesy copies to Judge Gershon and to my chambers, within ten (10) business days. Failure to file objections within the specified time waives the right to appeal the district court's order. *See* 28 U.S.C. § 636(b)(1).

March 14, 2001.